[No. 80209-2. En Banc.]
Argued February 10, 2011. Decided September 20, 2012.

THE STATE OF WASHINGTON, *Respondent*, v. CECIL EMILE DAVIS, *Appellant*.

288

290

292

294

*David B. Koch* and *Eric J. Nielsen* (of *Nielsen, Broman & Koch PLLC*) for appellant.

*Mark E. Lindquist, Prosecuting Attorney*, and *John M. Neeb* and *Kathleen Proctor, Deputies*, for respondent.

*Sarah A. Dunne, Nancy Lynn Talner*, and *Lila J. Silverstein* on behalf of American Civil Liberties Union of Washington, Washington Association of Churches, Lutheran Public Policy of Washington State, amici curiae.

*David R. Carlson* on behalf of Disability Rights Washington, amicus curiae.

¶1 ALEXANDER, J.[*] — In 1997, Cecil Davis raped, robbed, and murdered 65-year-old Yoshiko Couch. A jury found Davis guilty of aggravated first degree murder and unanimously agreed that no mitigating factors warranted leniency. *State v. Davis*, 141 Wn.2d 798, 807, 10 P.3d 977 (2000). Davis was sentenced to death. On direct appeal, we upheld the conviction and sentence. We later granted Davis's personal restraint petition (PRP), reversing his sentence because jurors had seen him in shackles. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 101 P.3d 1 (2004). At the new penalty proceeding, the jury found no mitigating factors warranting leniency and Davis was again sentenced to death. This appeal followed. *See* RCW 10.95.130. Finding no reversible error in Davis's second penalty proceeding, we again affirm the sentence of death.

## I. FACTUAL HISTORY

¶2 At approximately 2:30 a.m. on January 25, 1997, Cecil Davis was partying with friends outside his mother's home in the city of Tacoma when he said, "I need to rob somebody" and "I need to kill me a motherfucker." Report of Proceedings (RP) (Apr. 30, 2007) at 2638, 2641. Accompanied by his friend, Anthony Wilson, Davis proceeded to a home across the street from the party. Once there, Davis kicked open the door and started "beating on" and rubbing the breasts of an occupant of the home, Yoshiko Couch. *Id.* at 2643. At this point, Wilson left.

¶3 At approximately 11:30 a.m. the same day, friends of Couch found her dead in her bathtub, naked from the waist

---

[*] Justice Gerry L. Alexander is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

down, surrounded by bloody water and fecal matter. Wet towels were wrapped around Couch's head, and her vagina was red, raw, and covered in a white, powdery household cleanser. The bathroom smelled strongly of chemicals, and opened household cleansers were found within the room. Couch's wedding ring was missing from her ring finger, and her purse was lying open in a hallway.

¶4 An autopsy revealed that while alive, Couch's vagina had been lacerated by a hard object, not a penis; her face was bruised and marked in a manner consistent with manual suffocation; and her skin was degraded from xylene, a chemical found in cleaning agents. The physician who conducted the autopsy concluded that Couch died of asphyxia by suffocation and chemical toxicity.

¶5 Yoshiko Couch's husband, Richard Couch, who was disabled from a number of strokes and unable to walk, was downstairs in his bed when the crime occurred. The telephone that was usually on his nightstand had been moved to a closet and, thus, was out of his reach.

¶6 Extensive evidence connected Davis to the crime, including blood, hair, and fingerprint samples. Meat and cigarettes that were believed to have belonged to the Couches were found in Davis's possession. The morning after the crime, Davis offered to sell his mother a gold wedding band matching the description of Couch's wedding ring. Davis also made incriminating statements. Upon seeing a neighbor pointing toward his mother's home and talking to police, Davis told his sister, "That bitch was next." RP (Apr. 30, 2007) at 2605. In addition, upon hearing that the newspaper reported that he killed and raped Couch, he told a cellmate that "he might have killed the old bitch, but he didn't rape the old bitch." RP (May 2, 2007) at 2842-43.

## II. PROCEDURAL HISTORY

¶7 Davis was charged in Pierce County Superior Court with premeditated first degree murder with aggravating

circumstances of rape, robbery, and burglary. *Davis*, 141 Wn.2d at 821. In 1998, a jury found him guilty as charged. At the conclusion of the penalty phase of the trial, the jury found that there were no mitigating circumstances warranting leniency. Based on the jury's verdict, the trial judge, Frederick Fleming, sentenced Davis to death.

¶8 Davis filed a PRP challenging his conviction and sentence on several grounds, including that he received ineffective assistance of counsel because his attorney failed to object when jurors saw him in shackles. *Davis*, 152 Wn.2d at 757-60. We affirmed Davis's conviction but vacated the sentence, remanding for a new penalty phase based on our conclusion that shackling may have tainted the penalty proceeding and that his counsel was ineffective in not raising an objection to the shackling.

¶9 The second penalty proceeding took place in 2007 before a new jury. Judge Fleming again presided. Although the evidence presented at this penalty proceeding was similar to that presented in the first proceeding, the jury learned an additional fact—that in 2006, Davis had been convicted of second degree intentional murder for a killing that occurred the year before the murder of Couch. The jury did not find sufficient mitigating circumstances to warrant leniency, and Davis was again sentenced to death. Davis appealed, raising numerous issues that we address hereafter in addition to the issues this court is mandated to review pursuant to RCW 10.95.130.[1]

---

[1] Amicus Disability Rights Washington, as well as amici American Civil Liberties Union of Washington, Washington Association of Churches, and Lutheran Public Policy of Washington State (collectively ACLU), each submitted a brief asking us to reverse Davis's death sentence. Disability Rights Washington argues that RCW 10.95.030, Washington's statute prohibiting the death sentence for defendants with intellectual disabilities, violates the United States Constitution because it excludes defendants who do not meet the statutory definition of "intellectually disabled" but still have substantially impaired reasoning and impulse control. The ACLU contends that Davis's death sentence violates article I, section 14 of the Washington Constitution because Davis killed only one victim and was mentally impaired. The State moved to strike both amicus briefs, and we passed its motion to the merits. Davis has not raised any constitutional claim here relating to mental impairment, and later in this opinion, we conclude that Davis's

## III. ANALYSIS

¶10 In general, errors at a capital penalty proceeding are subject to heightened scrutiny. *State v. Stenson*, 132 Wn.2d 668, 743-44, 940 P.2d 1239 (1997). This requires a more careful look at the record but does not raise the standard of review.

### Issues Raised by Davis

1. Did the trial court abuse its discretion by failing to recuse itself after communicating ex parte with prosecutors?

¶11 After this court reversed the death sentence that had been imposed at Davis's first trial, the case returned to Judge Fleming's court for a new penalty phase. Upon agreement between Davis and the State, the trial court initially set trial for September 2005. By April 2005, Davis's counsel realized that they needed more time to prepare and, thus, sought a continuance. The trial court granted the defense request to continue the trial to April 2006.

¶12 On January 20, 2006, the defense again moved for a continuance, this time on the basis that it could not be ready for trial in April 2006 because its mitigation specialist would not be available. Faced with this motion, Judge Fleming expressed frustration and said that the conviction had been

> reversed because they may have seen somebody walking—may have seen somebody walking in shackles.
>
> . . . .
>
> And now we are eight years hence and back—I just think that everyone—litigants, society, everyone has a right to have these matters resolved in a reasonable period of time.

RP (Jan. 20, 2006) at 10-11.

article I, section 14 argument is not properly preserved for review. We need not consider issues raised only by amici. *Accord State v. Gonzalez*, 110 Wn.2d 738, 752 n.2, 757 P.2d 925 (1988). We therefore grant the State's motion.

¶13 Despite these concerns, Judge Fleming continued the trial to January 8, 2007, noting that he was continuing the penalty phase "for the *final* time." Clerk's Papers (CP) at 621. He went on to say:

> I want to be responsible and fair to both sides. And as you can tell I don't think we are being now. But after listening to you, Mr. [Ronald] Ness and Mr. [John] Neeb, I'll give you almost— well, it will be another year. To me, that is wrong. But maybe the state of our law now in this state requires it, and maybe it's the fair and just thing to do. But I'm not so sure.

RP (Jan. 20, 2006) at 18.

¶14 In October 2006, on his own and without consulting the parties, Judge Fleming decided to accelerate the trial date, apparently realizing that the penalty hearing would conflict with his scheduled February 2007 vacation. He envisioned a new schedule with voir dire beginning on December 4, 2006, and opening statements on January 2, 2007. To that end, Judge Fleming arranged for a courtroom, 150 potential jurors, and the necessary security to be available on December 4, 2006.[2]

¶15 On October 24, 2006, a court reporter told Deputy Prosecuting Attorney John Neeb that Judge Fleming wanted Neeb to come to courtroom 550 at 1:30 p.m. Shortly before 1:30, Judge Fleming saw another deputy prosecuting attorney, John Hillman, in a hallway in the Pierce County Courthouse. Judge Fleming asked Hillman to prepare a scheduling order according to the new schedule, approve it, and then give defense counsel a copy for signature. Hillman did as he was told and approved the order. Deputy Prosecuting Attorney Neeb arrived shortly thereafter, received

---

[2] Sometime before October 24, 2006, Judge Fleming's assistant did mention the possibility of accelerating the trial date to Deputy Prosecuting Attorney John Neeb. Neeb responded that he thought this was a bad idea. Neeb heard nothing further until the contact on October 24, 2006.

the same instructions,[3] and also signed the order. Soon thereafter, a deputy prosecutor delivered the order to Davis's counsel, who signed it, noting an objection to the changed date for trial.

¶16 Davis's counsel then moved to reschedule the trial date and for Judge Fleming to recuse himself based on what they alleged was improper ex parte contact. The State joined in the motion to reschedule the trial date but opposed the recusal motion. Following a hearing, Judge Fleming agreed to continue trial until April 2007 but denied the motion to recuse.

■ ¶17 Davis contends that Judge Fleming's ex parte communication with the deputy prosecuting attorneys violated former (1995) Canons 1, 2(A), and 3(A)(4) of the Code of Judicial Conduct (CJC)[4] and that these violations required Judge Fleming to recuse himself under former Canon 3(D)(1) (1995). The State concedes that ex parte contact occurred when Judge Fleming asked the deputy prosecutors to approve the scheduling order and deliver it to defense counsel for signature. It does not agree, however, that the contact required Judge Fleming to recuse. A trial judge's decision of whether to recuse himself or herself is reviewed for abuse of discretion. *State v. Leon*, 133 Wn. App. 810, 812, 138 P.3d 159 (2006) (citing *In re Marriage of Farr*, 87 Wn. App. 177, 188, 940 P.2d 679 (1997)).

■ ¶18 Former Canons 1 and 2(A) set forth general principles relating to the standards of independence and integrity that judges should maintain.[5] Former Canon 3(A)(4) specifically prohibits judges from engaging in ex parte contact, providing:

---

[3] The defense's memorandum indicates that only Neeb, not Hillman, was instructed to give a copy of the order to defense counsel. Whether one or both prosecutors were ordered to deliver the order to the defense is immaterial.

[4] Substantial amendments to the CJC became effective January 1, 2011.

[5] Former Canon 1 provides, "An independent and honorable judiciary is indispensable to justice in our society. Judges should participate in establishing, maintaining, and enforcing high standards of judicial conduct and shall personally observe those standards so that the integrity and independence of the judiciary

Judges should accord to every person who is legally interested in a proceeding, or that person's lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding.

Although the CJC does not define "ex parte communication," the parties agree that the primary definition is "'communication between counsel and the court when opposing counsel is not present.'" *State v. Watson*, 155 Wn.2d 574, 579, 122 P.3d 903 (2005) (quoting BLACK'S LAW DICTIONARY 296 (8th ed. 2004)); Appellant's Opening Br. at 32; Br. of Resp't at 19.

■■ ¶19 A violation of former Canons 1, 2(A), or 3(A)(4) does not necessarily require a judge to recuse. Rather, the rule for recusal is set forth in former Canon 3(D)(1), which provides in relevant part that "[j]udges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned." In determining whether recusal is warranted, actual prejudice need not be proved; a "mere suspicion of partiality" may be enough to warrant recusal. *Sherman v. State*, 128 Wn.2d 164, 205, 905 P.2d 355 (1995). "The test for determining whether the judge's impartiality might reasonably be questioned is an objective test that assumes that 'a reasonable person knows and understands all the relevant facts.'" *Id.* at 206 (quoting *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988)).

¶20 In *Sherman*, we held that a judge engaged in prohibited ex parte contact under former Canon 3(A)(4) when, at the judge's request, a judicial extern called an organization that played a key role in the case and discussed general procedures for monitoring people in the plaintiff's position. This ex parte communication warranted recusal under

will be preserved. The provisions of this Code are to be construed and applied to further that objective."

Former Canon 2(A) provides, "Judges should respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

former Canon 3(D), we concluded, because the judge "may have inadvertently obtained information critical to a central issue on remand," leading a reasonable person to question his impartiality. *Sherman*, 128 Wn.2d at 206.

¶21 In *In re Disciplinary Proceeding Against Sanders*, 159 Wn.2d 517, 524, 145 P.3d 1208 (2006), this court held that former Canon 3(D) required a justice to recuse himself from a consolidated case involving several sexually violent predators (SVPs) when he met with a group of SVPs, including at least one who was a party to the consolidated case and who inquired about a central issue in the case. This court concluded the justice's actions violated former Canons 1 and 2(A) and required recusal because a reasonable person would question the judge's partiality.[6] *Id.* at 525-26.

¶22 Here, as we have noted, the State concedes that ex parte contact occurred. That still leaves the question of whether a reasonable person who knew all relevant facts would conclude that Judge Fleming was actually prejudiced or appeared prejudiced. In answering that question, we observe that the record shows that although neither defense counsel nor the prosecution wanted an earlier trial date, Judge Fleming decided to reschedule the trial to complete trial in time for his February 2007 vacation and to complete sentencing within a reasonable time. When the defense pointed out the problems an earlier date would cause, Judge Fleming backed away from his earlier decision and gave Davis an additional four months to prepare and meet all relevant deadlines.

¶23 Unlike the problematic communications in *Sherman* and *Sanders*, nothing in Judge Fleming's ex parte communication revealed or implied a bias toward one party or that his future rulings in the case would be affected. The decision to accelerate trial, which the trial judged believed

---

[6] The Washington State Commission on Judicial Conduct held that the justice did not violate former Canon 3(A)(4)'s prohibition on ex parte conduct, so that canon was not addressed in the opinion.

was purely ministerial, was made well before the communication occurred. Furthermore, the judge did not discuss any substantive issue during the communication. While Davis correctly points out that former Canon 3(A)(4) does not require the communication to be substantive for a violation to occur, the content of the communication is key in evaluating whether the judge appears partial for purposes of former Canon 3(D).

¶24 Davis further argues that the ex parte communication must be viewed in light of several "relevant facts." Reply Br. of Appellant at 1-3. In our view, none of Davis's observations alter the impartial nature of the ex parte communication that occurred. Many of the observations relate to the judge's desire to complete trial without long delays, a consideration he emphasized in open court as being important to both sides. *E.g.*, RP (Jan. 20, 2006) at 10-11 ("[L]itigants, society, everyone has a right to have these matters resolved in a reasonable period of time."), 18 ("I want to be responsible and fair to both sides."); RP (Nov. 3, 2006) at 15 ("I consider it a court responsibility to have these cases tried, managed, in a manner that's fair to both sides. The defendant has a right to have this matter concluded, as do the people of the State of Washington."). If the desire to finish trial within a reasonable amount of time shows prejudice, trial judges would be forced to grant every continuance a defendant requested in order to avoid being considered partial. This is an untenable position.

¶25 In sum, Judge Fleming's conversation with deputy prosecutors and his conduct throughout the proceeding did not show bias toward the State or against Davis. Rather, it showed a desire to complete the penalty phase of Davis's trial within a reasonable length of time from Davis's conviction and in time for the judge to enjoy his scheduled

vacation. We therefore reject Davis's claim that Judge Fleming's denial of the recusal motion was error.[7]

2. Did the trial court abuse its discretion by dismissing two jurors for cause?

¶26 In a written questionnaire, juror 1 indicated that she was in favor of imposing the death penalty on anyone who kills another person.[8] During voir dire, this juror indicated that she was 20 years old and had never before been questioned as a potential juror. Thus, when voir dire began, she understandably felt "[a] little bit" nervous and intimidated. RP (Apr. 10, 2007) at 324. The juror agreed with defense counsel's suggestion that she would "rather not be in this position" of being a juror but would do her duty if she sat on the case. *Id.* at 332. In contrast to that statement, however, she told the prosecutor that "I don't think that I could personally [impose the death penalty]—I would feel that I would be sending someone to death, and I don't think I could do that, just because I would probably just feel really bad if I did." *Id.* at 333.

¶27 Judge Fleming then asked the juror which statement best described her feelings: "under no circumstance would you consider voting for the death penalty" or "can consider the death penalty in an appropriate case." *Id.* at 333, 334. The juror said the first statement better described

---

[7] We note that our holding is consistent with our recent revisions to the CJC. The new canon prohibiting ex parte communications expressly provides that "[w]hen circumstances require it, ex parte communication for scheduling, administrative, or emergency purposes, which does not address substantive matters, . . . is permitted, provided:

"(a) the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication; and

"(b) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication, and gives the parties an opportunity to respond."

CJC Canon 2.9(A)(1). Judge Fleming's ex parte contact would almost certainly be permissible under this exception.

[8] A blank copy of the jury questionnaire is included in the clerk's papers, but the completed questionnaires are not in the record.

her feelings because "I don't think I could personally vote for someone to go on death penalty." *Id*. at 334. After the questioning of juror 1 was completed, she was excused from the courtroom. The State then challenged her for cause based on her views on the death penalty.

¶28 After a colloquy with counsel, the judge called juror 1 back to the courtroom and reminded her of her earlier statement. The following exchange then occurred:

THE COURT: What did you mean when you said, "I don't think I could do that."

JUROR NO. 1: Personally, I don't think I could vote him to death. I don't think I could—

THE COURT: Well, you're the only one that would know in the appropriate case.

JUROR NO. 1: I know. I just—I would feel bad if I did it, just I would feel guilty if I—

THE COURT: So, you are telling me, even in an appropriate case, you couldn't do it?

JUROR NO. 1: Well, okay, an appropriate case, I think I could. I feel like I'm contradicting myself.

*Id*. at 352. In further questioning by the deputy prosecuting attorney and defense counsel, juror 1 reiterated multiple times that she did not know whether she could vote for the death penalty in the appropriate case. Defense counsel questioned her further:

Q. . . . . And what you are saying is—tell me if I'm wrong—is that even in an appropriate case, you couldn't [sentence someone to death]?

A. I don't think—I don't think I could personally do it, no. I don't think I would feel comfortable with making that decision.

Q. Under any circumstances?

A. Under any.

*Id*. at 367. Soon afterward, over Davis's objection, the court dismissed juror 1 for cause, concluding that

I'm comfortable now in considering, as I'm required to do, her manner and her behavior and so on. She wanted so much to follow the law, which she thinks the Court represents, but it was against her personal beliefs, and I am convinced that there aren't any circumstances, except for, she said, [Gary] Ridgway, that would allow her to, in this case, vote for the death penalty.

*Id*. at 369.

¶29 Two days later, voir dire began for juror 39. After questioning, neither the prosecution nor Davis challenged this juror for cause. The juror then told the trial judge that her husband had told her, based on his Internet search, that he thought a juror in Davis's original trial had been influenced by seeing Davis in leg irons. Juror 39 said that she stopped her husband before he could elaborate. She also said that she could keep her husband from doing something like that again.

¶30 Although the State did not challenge juror 39 for cause, it asked the court to instruct the juror to disregard what she heard. Davis agreed and did not register a challenge for cause. The trial judge, however, decided to excuse juror 39 for cause, noting that

the record, other than this, would reflect that this juror is intelligent, could be fair to both sides, would listen to the evidence and make a conscientious decision based on the evidence that is heard in this proceeding, but I can't take a chance and not follow the ruling of the court that she may be tainted because she knows at one time, in one proceeding, that Mr. Davis was seen in shackles, which carries with it, the court has said, an inference of he is dangerous.

*Id*. at 870-71.

¶31 Davis contends the trial court abused its discretion in dismissing jurors 1 and 39 for cause. In support of that contention, Davis argues that juror 1's objections to the death penalty did not justify her dismissal for cause because "she said she could perform her duty as a juror despite her personal misgivings about imposing the death

penalty." Appellant's Opening Br. at 48. Regarding juror 39, Davis asserts that her knowledge of facts surrounding the prior trial did not justify her dismissal for cause.

■ ¶32 We review a trial court's ruling on a challenge for cause for manifest abuse of discretion. *State v. Gregory*, 158 Wn.2d 759, 814, 147 P.3d 1201 (2006). "The reason for this deference is that the trial judge is able to observe the juror's demeanor and, in light of that observation, to interpret and evaluate the juror's answers to determine whether the juror would be fair and impartial." *State v. Gentry*, 125 Wn.2d 570, 634, 888 P.2d 1105 (1995).

■ ■ ¶33 The Sixth and Fourteenth Amendments to the United States Constitution, as well as article I, section 22 of the Washington Constitution, guarantee a criminal defendant the right to trial by an impartial jury. *Taylor v. Louisiana*, 419 U.S. 522, 526, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); *see Gregory*, 158 Wn.2d at 813. These provisions are not offended by excluding from capital case penalty hearings jurors whose views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980)); *Gentry*, 125 Wn.2d at 635. However, jurors may not be dismissed simply because they have conscientious scruples against the death penalty if they can put aside those beliefs and follow the law. *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968); *Gregory*, 158 Wn.2d at 814.

¶34 In *Gregory*, we held that a trial court did not abuse its discretion in dismissing for cause a juror who had indicated on her questionnaire that death was appropriate for serial murderers but testified during voir dire that she could follow the court's instructions and impose the death penalty if warranted. *Gregory*, 158 Wn.2d at 813-15. The latter statement appeared to contradict other statements during voir dire that she could not vote for the death

penalty. The juror explained the apparent contradiction by saying she could tell what answer the attorneys wanted and felt uncomfortable disagreeing. *Id.* at 814. We held that "[g]iven juror 1's initial answers to questions regarding the death penalty and the suggestion that she changed her answers to please the attorneys, it is not surprising that the trial judge had the definite impression that juror 1 could not 'faithfully and impartially apply the law.'" *Id.* at 815 (quoting *Witt*, 469 U.S. at 426).

¶35 In *Gentry*, we upheld the trial court's exclusion of two jurors who testified they were "uncertain" they could impose the death penalty and "could not assure the trial court that they would be able to follow the instructions of the court regarding imposition of the death penalty." *Gentry*, 125 Wn.2d at 635. Despite these jurors' lack of certainty, we concluded that the trial court reasonably determined that the jurors' beliefs would substantially impair their abilities to perform their duties, especially given the trial court's unique ability to observe the jurors' demeanor.

¶36 In light of our decisions in *Gregory* and *Gentry*, we are satisfied that Judge Fleming did not abuse his discretion in dismissing juror 1 for cause. Juror 1 indicated at least four times that she did not think she could personally impose the death penalty on anyone. Under *Gentry*, the fact that she prefaced her comments with "I think" does not bar the trial court from finding her beliefs would substantially interfere with her ability to perform her duty as a juror; unmistakable clarity is not required to support such a finding. As in *Gregory*, the contradictions in juror 1's testimony made her dismissal appropriate even though she said several times that she could follow the law.[9]

---

[9] Faced with a similar situation, the United States Supreme Court explained that such contradictions are both common and understandable: "The testimony of each of the three challenged jurors is ambiguous and at times contradictory. This is not unusual on *voir dire* examination .... It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the

The trial judge said he "must have somehow or another intimidated" the juror and that her demeanor showed that she wanted to follow the law but, on reflection, concluded that imposing the death penalty would violate her personal beliefs. RP (Apr. 10, 2007) at 369. The trial court had the opportunity to observe this juror and in our view did not abuse its discretion in dismissing her for cause.

¶37 Davis argues the trial court abused its discretion in dismissing juror 39 for cause on the basis that knowledge of prior proceedings does not establish prejudice under *State v. Rupe*, 108 Wn.2d 734, 750, 743 P.2d 210 (1987) and *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984). Appellant's Opening Br. at 44-46. RCW 4.44.170(2) allows the trial judge to dismiss a juror for cause who "cannot try the issue impartially and without prejudice."

¶38 In *Rupe*, we held the court did not abuse its discretion when it denied a challenge for cause to a juror who read or heard that the defendant had been sentenced to death in an earlier penalty hearing and said he thought the previous jury did a good job. *Rupe*, 108 Wn.2d at 750. The juror assured the trial court that he could render a verdict based on the evidence presented at the trial. We concluded that "[k]nowledge of prior proceedings alone is insufficient to establish juror bias." *Id.* Similarly, in *Yount*, the United States Supreme Court determined that the trial court did not abuse its discretion in allowing the defendant's trial to go forward with jurors who had been exposed to news coverage of the defendant's murder conviction four years earlier when the jurors assured the trial court they could make an impartial decision. *Yount*, 467 U.S. 1025.

community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading." *Patton v. Yount*, 467 U.S. 1025, 1038-39, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984).

¶39 Davis's reliance on *Rupe* and *Yount* is misplaced for several reasons. First, Davis ignores the standard of review when he argues that the retention of the jurors in *Rupe* and *Yount* logically necessitates juror 39's retention here. Under a manifest abuse of discretion standard, the fact that a trial court did not abuse its discretion in retaining jurors does not mean that the court would have abused its discretion by dismissing the jurors. "The question is not whether we, as a reviewing court, might disagree with the trial court's findings, but whether those findings are fairly supported by the record." *Gentry*, 125 Wn.2d at 635. Contrary to Davis's assertion, *Rupe* and *Yount* do not mandate the conclusion that retaining a juror with knowledge of prior proceedings is the only acceptable result.

¶40 Davis's case is also materially distinguishable from *Rupe* and *Yount* where the jurors' knowledge of the prior trial was not inherently prejudicial. In contrast, we reversed Davis's first death sentence because one juror's "partial and fleeting" view of Davis in shackles during the guilt phase of the trial prejudiced the penalty phase. *Davis*, 152 Wn.2d at 705. We reasoned that shackling implies the defendant is dangerous and unmanageable, potentially leading the jury to draw negative inferences regarding his future dangerousness. The partial and fleeting nature of the juror's view in *Davis* shows the inference of dangerousness arose not from the impact of repeatedly seeing the defendant in shackles over several weeks in the courtroom, but from the mere fact of the shackling, however brief. Thus, the trial court here could reasonably conclude juror 39 was prejudiced by simply knowing Davis had been shackled.

¶41 Finally, we believe that it is inappropriate to defer to a juror's assessment of his or her own ability to be objective when the knowledge at issue relates to shackling. In *Rupe* and *Yount*, the jurors' assurances that they could be impartial were critical to upholding the jurors' retention. In contrast, in our earlier *Davis* decision, we explicitly refused to consider the juror's testimony that shackling did not

affect his decision because the statement was made several years after the verdict was rendered. *Davis*, 152 Wn.2d at 688-89. Given this lack of deference to the juror's own assessment of his credibility, the trial court here reasonably concluded it could not rely on juror 39's testimony that knowledge of past shackling would not influence her decision. Under a manifest abuse of discretion standard, we will not disturb the trial court's reasonable interpretation of our earlier decision in this case or its finding that juror 39 possessed prejudicial knowledge warranting dismissal.

¶42 Davis also argues RCW 4.44.170 does not support juror 39's removal because that statute refers to the "challenged person," and neither Davis nor the State challenged the juror for cause. Reply Br. of Appellant at 8. CrR 6.4(c)(1) states that "[i]f the judge after examination of any juror is of the opinion that grounds for challenge are present, he or she shall excuse that juror from the trial of the case." This rule makes clear that a trial judge may excuse a potential juror where grounds for a challenge for cause exist, notwithstanding the fact that neither party to the case exercised such a challenge. In fact, the judge is obligated to do so. The trial court's dismissal of juror 39 for cause was, therefore, proper.

3. Did the trial court abuse its discretion in excluding Davis's aunts' testimony?

¶43 On May 7, 2007, slightly over a month into the penalty hearing, the trial court was called upon to decide whether videotaped interviews of Davis's paternal aunts, Eula Mae Brooks and Lillie Mae Jones, could be admitted.[10] The interviews took place in Kansas City, Missouri, where Brooks and Jones lived, and were conducted by the defense

---

[10] The State had one week's notice of the defendant's intent to submit the video tapes of the interviews, and Brooks's and Jones's names were not included on a witness list.

mitigation specialist, Mary Goody.[11] Brooks and Jones were not placed under oath during the video interviews but later signed declarations summarizing the information covered in their interviews. Each interview lasted slightly less than 20 minutes.

¶44 In the interviews, Brooks and Jones each discussed their personal histories and early memories. They both mentioned that Davis's father had trouble learning and dropped out of school early. Brooks said that although she never visited Davis or Davis's mother, Cozetta Taylor, she would have tried to help Davis if she had known of his problems in school or with his temper. Jones said that she had occasionally visited Taylor. She indicated that Taylor did not take care of her children or seem interested in them. Both aunts discussed how their mother, Davis's paternal grandmother, was institutionalized for mental illness when Brooks and Jones were in high school.

¶45 After reading the declarations and viewing the redacted video, the trial court excluded the interviews, concluding that portions of each were inadmissible on the grounds of hearsay, lack of personal knowledge, and relevance. The trial court also reasoned that the videotaped interviews were inadmissible because the interviewees were not subject to cross-examination.

¶46 Davis argues that excluding his aunts' videotaped interviews violated his right to present mitigating evidence under the Eighth and Fourteenth Amendments to the United States Constitution; article I, sections 3 (due process) and 14 (cruel punishment) of the Washington Constitution;[12] and RCW 10.95.060(3) and RCW 10.95.070,

---

[11] The defense sought to admit into evidence two copies of the video, a complete interview and a redacted version which it intended to show to the jury. All discussion of the interviews in this fact section is based on viewing the redacted video, exhibit 226, unless otherwise noted.

[12] Davis cites Washington State Constitution article I, sections 3 and 14 as sources of his right to present mitigating evidence, but he cites only *Bartholomew* I and *Bartholomew* II for the proposition that the Washington State Constitution

two of Washington's special sentencing proceeding statutes. We review the trial court's evidentiary rulings for abuse of discretion. *See State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967 (1999); *Stenson*, 132 Wn.2d at 701. Discretion can be abused if the trial court's action is manifestly unreasonable or based on untenable grounds or reasons. *Finch*, 137 Wn.2d at 810. "However, a trial court's determination to exclude evidence may be sustained on any proper basis within the record and will not be reversed simply because the trial court gave a wrong or insufficient reason for its determination." *State v. Markle*, 118 Wn.2d 424, 438, 823 P.2d 1101 (1992).

¶47 Under the Eighth and Fourteenth Amendments, the finder of fact in a capital proceeding must "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). Notwithstanding this requirement, the trial court maintains its traditional authority "to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604 n.12; *see also Gregory*, 158 Wn.2d at 856-57 (facts of other crimes resulting in the death penalty were not relevant mitigating evidence because not related to the particular defendant or crime at issue); *State v. Pirtle*, 127 Wn.2d 628, 671, 904 P.2d 245 (1995) (essay written by victim in opposition to the death penalty was not relevant mitigating evidence because not related to the defendant's moral culpability).

contains such a right. *E.g.*, Appellant's Opening Br. at 50, 54 (citing *State v. Bartholomew*, 98 Wn.2d 173, 194, 654 P.2d 1170 (1982) (*Bartholomew* I), *vacated*, 463 U.S. 1203, 103 S. Ct. 3530, 77 L. Ed. 2d 1383 (1983), *aff'd on remand*, 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II)). While *Bartholomew* II addressed the Washington State Constitution's limits on the introduction of *aggravating* factors at a capital penalty hearing, its analysis of *mitigating* evidence was based exclusively on federal law. *Bartholomew* II, 101 Wn.2d at 639-42. Davis has not provided any substantive argument regarding the Washington State Constitution. We therefore decline to address how the Washington State Constitution relates to this issue.

¶48 In the instant case, the trial court correctly determined that the vast majority of Jones's and Brooks's offerings were not relevant mitigating evidence. The stories regarding their childhoods, for example, clearly do not relate to Davis's character, record, or the circumstances of the offense. The fact that Davis's father may have had difficulty in school also is unrelated to Davis's character or moral culpability because the difficulty occurred before Davis was born. The fact that Brooks never visited Davis or his mother renders her opinion that Davis had a hard upbringing lacking in foundation and irrelevant.

¶49 The evidence of Davis's grandmother's mental illness is also irrelevant because it was not connected to Davis's mental health or upbringing. One of the defense mental health experts considered records showing that Davis's grandmother had been institutionalized for schizophrenia, but when asked what information he used to reach his opinion about Davis, the expert did not mention the grandmother's illness. RP (May 9, 2007) at 3247-48. Furthermore, there was no evidence that Davis suffered from schizophrenia or that Davis knew his grandmother or had any contact with her.[13] In the absence of testimony connecting the grandmother's illness to Davis's upbringing or mental health, it simply has no bearing on Davis's character, record, moral culpability, or the circumstances of the crime.

¶50 A few facts offered by Davis's aunts probably meet the low bar for relevance. Jones's observation that Davis had a difficult and troubled childhood is a relevant mitigating factor. *See Eddings v. Oklahoma*, 455 U.S. 104, 116, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). In addition, the aunts' concern had relevance on the issue of mercy, their testimony showing that two family members were willing to be interviewed on Davis's behalf. In *Stenson*, we held that the

---

[13] The defense mental health expert discussed here confirmed that he did not diagnose Davis with schizophrenia. A review of the defense witnesses' testimony reveals no other discussion of Davis's grandmother or her illness.

trial court did not err in excluding on relevance grounds testimony concerning the potential impact an execution would have on the defendant's family, but we noted with approval that the trial court had admitted testimony from family members indirectly showing that the defendant had a caring family. Here, in contrast, the exclusion of Davis's aunts' interviews completely eliminated the views of two family members from the jury's consideration, a fact that was underscored by the State's comment in closing argument that only two members of Davis's large family (his mother and brother) testified on Davis's behalf. *See Skipper v. South Carolina,* 476 U.S. 1, 5 n.1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986) (evidence that the defendant had made a good adjustment in prison was relevant mitigating evidence, especially because the prosecutor argued during closing that defendant would be dangerous and even rape other prisoners if sentenced to life in prison).

¶51 Davis argues that beyond the threshold requirement of relevance, the rules of evidence may not bar the admission of relevant mitigating evidence in a capital case. The State counters that while the rules of evidence are relaxed in capital penalty proceedings, "admissibility is not unfettered"; evidence still must be presented in a reliable form. Br. of Resp't at 44.

¶52 The United States Supreme Court has held that " 'the hearsay rule may not be applied mechanistically to defeat the ends of justice' " by excluding reliable mitigating evidence from a capital penalty proceeding. *Green v. Georgia,* 442 U.S. 95, 97, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979) (quoting *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)). The Court has not, however, totally prohibited use of the rules of evidence in death penalty cases. Because reliability is critical in determining whether to impose the sentence of death, the Eighth Amendment "does not deprive the State of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted."

*Oregon v. Guzek*, 546 U.S. 517, 526, 126 S. Ct. 1226, 163 L. Ed. 2d 1112 (2006).

¶53 RCW 10.95.060(3) appears to provide an unfettered right to admit evidence without regard to the rules of evidence in a capital penalty proceeding, as it states that "[t]he court shall admit any relevant evidence which it deems to have probative value *regardless of its admissibility under the rules of evidence*, including hearsay evidence." (Emphasis added.) Our case law, however, shows the trial court is not completely barred from considering reliability in capital penalty proceedings. In *State v. Bartholomew*, 101 Wn.2d 631, 646, 683 P.2d 1079 (1984) (*Bartholomew* II), we held that although polygraph evidence was inadmissible in a normal trial, absent stipulation, mitigating polygraph evidence was admissible in a capital penalty hearing if (1) the trial judge was convinced the examiner was qualified and the test was conducted under proper conditions and (2) the opposing party had the opportunity to cross-examine the polygraphist. *Bartholomew* II shows that while the rules of evidence are relaxed in capital penalty phase trials, the trial court maintains its traditional ability to control the reliability of mitigating evidence.

¶54 We are satisfied that the trial court properly exercised its discretion in excluding the few relevant parts of the interviews because the interviews were presented in an unreliable form. As we have observed, Brooks and Jones had little to no contact with Davis during his childhood. Consequently, their opinions that Davis had a bad mother and childhood could have been based on family gossip, what they heard from the mitigation specialist in preparation for the interview, or even what they read in the newspaper about Davis's previous trials. Furthermore, the defense obtained and presented the evidence in a manner that gave the State almost no chance to explore these potential problems, even though a video deposition or in-person

testimony appears to have been possible.[14] Accordingly, the interviews' exclusion was not a wholesale bar to the admission of relevant mitigating evidence or a mechanistic application of the rules of evidence. Rather, the trial court properly exercised its "authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted." *Guzek*, 546 U.S. at 526.

¶55 In sum, the trial court properly excluded the videotaped interviews because their content was largely irrelevant, and any relevant portions were not presented in a reliable form.

4. Did the trial court abuse its discretion in admitting as rebuttal evidence a police officer's testimony about Davis's mental state shortly after the crime?

¶56 The defense presented the testimony of four experts regarding Davis's mental health: Dr. Richard Kolbell, psychologist; Dr. Barbara Jessen, neurologist; Dr. Zakee Matthews, psychiatrist; and Dr. Kenneth Muscatel, psychologist.

¶57 Kolbell, Matthews, and Muscatel each diagnosed Davis's mental condition based on examinations performed in 2006 or 2007. Although their exact diagnoses varied, the doctors all opined that Davis bordered on mentally retarded[15] but was not actually classifiable as such. They also

---

[14] The defense conceded that video depositions could have been taken. Regarding in-person attendance, Brooks wrote in her declaration that "I am unable to come to Tacoma, WA to testify on behalf of Cecil Davis, my nephew. My son recently died and I took a bad fall after that. I am not feeling very well at this time." Ex. 228, ¶ 3. In her video interview, however, she did not say that she was unable to testify in person. Jones's written declaration omits any mention of her unavailability to testify in person, and in her videotaped interview, she said simply that she was too old and just did not think she could come. Ex. 227, 226. At the hearing, the trial court noted that the aunts "didn't appear to be infirm in any way" and concluded there was an insufficient basis to establish they were unavailable to testify. RP (May 7, 2007) at 3055-56; CP at 1191.

[15] At the time of Davis's sentencing, Washington's death penalty statutes prohibited the execution of "mentally retarded" individuals. Former RCW 10.95-.030(2) (1993). In 2010, pursuant to a statute promoting respectful language for

indicated that Davis suffered from other cognitive disorders such as posttraumatic stress disorder and learning disabilities. These diagnoses were based on a series of technical tests, such as intelligent quotient (IQ) tests. Each doctor also discussed how the 2006 or 2007 diagnosis compared to Davis's mental condition in 1997, the year he committed the crime.[16]

¶58 Kolbell and Muscatel both testified about Davis's behavior during testing. Kolbell said that Davis's functional levels could be measured in part by his ability to converse, follow a train of thought, and speak coherently. Kolbell also noted that at the beginning of the interview, he asked Davis what day it was to check whether Davis was oriented. Muscatel noted that while his interview of Davis "was really not the focus of the examination, I wanted to see if he could answer questions, respond, you know, to me, if I had to adjust the testing to suit his individual needs." RP (May 10, 2007) at 3364. During cross-examination, without objection by the defense, Kolbell and Muscatel both said Davis was able to maintain a normal demeanor during their conversations.

¶59 Jessen testified regarding the results of an electroencephalogram (EEG) taken of the defendant's brain in August 1997. She concluded that the EEG showed a generalized slowing in Davis's brain that could have existed since birth or could have been caused by a later infection, head

---

people with disabilities, the death penalty statutes were revised to use the term "intellectually disab[led]" instead of "mentally retarded." *See* RCW 44.04.280 (respectful language); Laws of 2010, ch. 94, §§ 1-5 (revision to death penalty statutes). For clarity and accuracy, this opinion uses the term "mentally retarded" when that term was used by the court, parties, or witnesses at trial. When referring to the current death penalty statutes, we use the term "intellectually disabled" to be consistent with the respectful language requested by RCW 44.04.280.

[16] *E.g.*, RP (May 8, 2007) at 3111 (Dr. Kolbell notes that defendant scored higher on 1997 IQ tests than on the 2006 IQ tests); RP (May 9, 2007) at 3255 (Dr. Matthews opines that Davis had a major mental illness in 1997); RP (May 10, 2007) at 3383-85 (Dr. Muscatel discusses drop in IQ scores between 1997 and 2007).

trauma, medications, or alcohol and drug use. Without objection, the State cross-examined Jessen about Davis's demeanor during a physical exam she conducted in July 1997. She agreed that Davis was alert, cooperative, oriented, spoke normally, had a reasonably good memory, and had no trouble using or pronouncing words.

¶60 The State's rebuttal consisted of testimony by Sergeant Tom Davidson about his observations of Davis during an interview on January 31, 1997, six days after the crime was committed. The defense moved to exclude Davidson's testimony on the ground that it did not rebut the mental health experts' testimony. The trial court rejected the argument and allowed Davidson to take the stand.

¶61 Davidson testified that he had been a police officer for 26 years and, during that time, had interviewed hundreds of criminal suspects. Over relevance objections, Davidson testified that he had encountered people of different education levels and opined that academic education does not necessarily correlate with "street smarts." *Id.* at 3458-59. Davidson said he did not have any formal training in psychology or psychiatry but rather used his own scale to make observations about people he interviewed. He indicated that if he interviewed someone and had questions about that person's mental health, he would notify the jail so it could properly deal with the person.

¶62 Davidson then discussed the interview with Davis on January 31, 1997, which he conducted along with three other detectives. He said Davis was paying attention and seemed to understand when advised of his rights. According to Davidson, Davis gave appropriate responses to questions during the two-and-a-half-hour interview and never showed signs that he did not understand why he was there or what they were discussing. Davidson said that Davis looked at the person asking the question and showed no confusion when the subject changed. Davidson concluded by stating that nothing about the interview gave him cause for concern about Davis's mental status.

¶63 Davis contends that the trial court erred in admitting Davidson's testimony during the State's rebuttal case on several bases. We review the trial court's evidentiary rulings for abuse of discretion. *Finch*, 137 Wn.2d at 810; *Stenson*, 132 Wn.2d at 701.

¶64 Unlike with mitigating evidence, the introduction of aggravating factor evidence must strictly comply with the rules of evidence. *Bartholomew* II, 101 Wn.2d at 640-41; *Gentry*, 125 Wn.2d at 626. While the State may admit evidence to rebut the defendant's case, that evidence must be

> "relevant to a matter raised in mitigation by defendant. Evidence might be relevant, for instance, if it casts doubt upon the reliability of defendant's mitigating evidence. We do not intend, however, that the prosecution be permitted to produce any evidence it cares to so long as it points to some element of rebuttal no matter how slight or incidental."

*Bartholomew* II, 101 Wn.2d at 643 (quoting *State v. Bartholomew*, 98 Wn.2d 173, 198, 654 P.2d 1170 (1982) (*Bartholomew* I), *vacated*, 463 U.S. 1203, 103 S. Ct. 3530, 77 L. Ed. 2d 1383 (1983), *aff'd on remand*, 101 Wn.2d 631). Relevant rebuttal evidence is subject to a balancing test similar to ER 403, where it is admitted " ' "[o]nly if the rebuttal value of the evidence outweighs the prejudicial effect." ' "[17] *State v. Lord*, 117 Wn.2d 829, 891, 822 P.2d 177 (1991) (quoting *Bartholomew* II, 101 Wn.2d at 643 (quoting *Bartholomew* I, 98 Wn.2d at 198)).

¶65 Davis first argues that Davidson's testimony was improper rebuttal evidence because, in his view, the professional opinions about his mental health could be rebutted only by expert testimony diagnosing his mental

---

[17] Although the balancing test as articulated in *Bartholomew* II does not explicitly say "unfair prejudice," as does ER 403, the fact that the prejudice must be unfair or unreasonable is implicit in that decision and its progeny. *Bartholomew* II observed that " '[c]onceivably, any aggravating information could be said to prejudice a defendant, but presumably the Court intended to restrict the concept to undue or unreasonable prejudice.' " *Bartholomew* II, 101 Wn.2d at 637 (quoting *Bartholomew* I, 98 Wn.2d at 195).

condition. However, the defendant's own experts established that Davis's conduct was relevant to determining whether he was affected by a mental illness. Kolbell said that Davis's ability to converse, follow a train of thought, and speak coherently factored into his "functional levels." RP (May 8, 2007) at 3141. Kolbell, Muscatel, and Jessen all testified, without any defense objection, to Davis's ability to communicate reasonably and understandably. From this testimony, the jury could reasonably conclude that Davis's ability to engage in a "normal" manner during an interview six days after the crime was relevant to whether mental illness influenced the crime's commission. Davidson's testimony was therefore a proper rebuttal.

¶66 Davis also contends that Davidson's testimony about his interviewing experience and the difference between "street smarts" and academic knowledge had no relevance. In our view, this testimony laid a proper foundation for Davidson's testimony about Davis's behavior by showing why Davidson was capable of making the observations that he did. This aided the jury in weighing the credibility of Davidson's observations.

¶67 Davis is also incorrect that Davidson's testimony was unduly prejudicial under the ER 403-like balancing test for rebuttal evidence in a capital case. The probative value of Davidson's testimony was high because it provided a firsthand observation of Davis's mental state near the time of the crime and allowed the jury to weigh the mental health experts' after-the-fact evaluations. In contrast, the prejudicial value was low because the evidence was not particularly gruesome, technical, or otherwise likely to cause an emotional or irrational decision.[18]

---

[18] Davis suggests the court erred by not balancing prejudice against probative value on the record. Reply Br. of Appellant at 27. However, balancing on the record was not required. We have repeatedly compared the balancing test for rebuttal evidence in a capital sentencing case to ER 403. *Lord*, 117 Wn.2d at 891; *Bartholomew* II, 101 Wn.2d at 643; *Bartholomew* I, 98 Wn.2d at 198. In contrast to ER 404(b) and ER 609(b), a trial court is not required to balance the interests weighed in ER 403 on the record. *See Carson v. Fine*, 123 Wn.2d 206, 226, 867 P.2d

¶68 Davis argues, additionally, that Davidson's testimony was "thinly veiled" opinion testimony that Davis was not mentally impaired, an opinion that Davidson was not qualified to render since he was not qualified as an expert witness under ER 702. Appellant's Opening Br. at 63. The State did not, however, seek to admit Davidson as an expert witness. He was a fact witness and, consistent with this understanding, he testified only to his personal observations of and reactions to Davis's behavior. The State specifically elicited testimony from Davidson that he was not trained in psychology or psychiatry. The requirements for expert testimony in ER 702 are therefore inapplicable.

¶69 Alternatively, Davis argues that Davidson's testimony was inadmissible lay opinion testimony under ER 701. "It is well established in Washington that a lay witness may testify concerning the sanity or mental responsibility of others, so long as the witness' opinion is based upon facts he personally observed, and the witness has testified to such facts." *State v. Crenshaw*, 27 Wn. App. 326, 332-33, 617 P.2d 1041 (1980) (trial court did not abuse its discretion in admitting lay persons testimony that the defendant " 'seemed very normal' " on the day he decapitated his wife and police officer testimony about the defendant's sanity soon after the offense), *aff'd*, 98 Wn.2d 789, 659 P.2d 488 (1983).[19] Here, Davidson testified about Davis's behavior during the interview and said that he personally had no concerns about Davis's mental health. Unlike the facts in cases cited by Davis, Davidson never invaded the jury's province by testifying to an ultimate issue, such as whether Davis suffered from a mental illness at the time of the crime. *See Ashley v. Hall*, 138 Wn.2d 151, 156, 978 P.2d 1055 (1999) (lay witness's testimony that accident was "unavoidable" was improper because it went beyond his rational

---

610 (1994). Particularly here, where the defense did not even raise ER 403 or unfair prejudice in its motion to exclude the evidence, it would be inappropriate to require a balancing analysis on the record.

[19] On appeal, the defendant did not raise the issue of lay person testimony regarding the defendant's mental state. *Crenshaw*, 98 Wn.2d at 803.

sense perceptions to give an opinion on the ultimate issue of liability); *State v. Farr-Lenzini*, 93 Wn. App. 453, 461, 970 P.2d 313 (1999) (trooper's testimony that defendant was trying to get away from him was improper lay opinion where defendant's intent to elude a police officer was an element of the crime). Davidson's testimony was admissible as a lay opinion.

¶70 In summary, the trial court did not abuse its discretion in admitting Davidson's testimony. It properly rebutted the defense's mental health experts because it gave the jury a tool by which to evaluate Davis's mental state near the time of the crime and thereby weigh Davis's expert testimony regarding his mental health. It was not unduly prejudicial and was an admissible lay opinion under ER 701.

5. Did the trial court err in not instructing the jury that "major mental illness" could be a mitigating factor?

¶71 The trial court gave the following instruction regarding mitigating evidence:

> A mitigating circumstance is a fact about either the offense or about the defendant which in fairness or in mercy may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense.
>
> . . . .
>
> You are also to consider as mitigating circumstances any other factors concerning the offense or the defendant that you find to be relevant, including, but not limited to, the following:
>
> Whether the murder was committed while the defendant was under the influence of extreme mental disturbance, or
>
> Whether, at the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect.

CP at 1165; RP (May 15, 2007) at 3490. The two mitigating circumstances listed in this instruction correspond to two

statutory mitigating factors. RCW 10.95.070(2), (6). Over Davis's objection, the court rejected Davis's proposed instruction, which was identical to the instruction actually given except that it replaced the last paragraph with two nonstatutory mitigating circumstances: "[w]hether the defendant is mentally retarded" and "[w]hether the defendant suffers from a major mental illness." CP at 1119.

¶72 Davis contends that because the trial court's instruction on mitigating evidence led jurors to believe that the listed factors were the only mitigating factors relating to mental illness that it could consider, the instruction violated his right to have the fact finder consider all relevant mitigating circumstances.

¶73 In determining whether a jury instruction runs afoul of the constitutional requirement that the fact finder in a capital proceeding consider all relevant mitigating evidence, the test is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990); *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 921, 952 P.2d 116 (1998) (quoting *Boyde*, 494 U.S. at 380). The instruction must be viewed in light of the overall charge to the jury, not in " 'artificial isolation.' " *Benn*, 134 Wn.2d at 922 (internal quotation marks omitted) (quoting *Boyde*, 494 U.S. at 378).

¶74 In *Gentry*, we held that "[t]here is no constitutional requirement that each relevant mitigating circumstance be the subject of a specific instruction to the jury. The requirement is that such evidence be allowed to be presented to the jury, but a specific instruction as to each potentially mitigating factor is not mandated." *Gentry*, 125 Wn.2d at 650-51 (citing *Johnson v. Texas*, 509 U.S. 350, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993)). While we did hold in *Gentry* that the trial court did not err when it included nonstatutory mitigating circumstances in the jury instruction, we noted that in future cases, the better practice would

be to include any statutory mitigating factors requested by the defendant but not to enumerate nonstatutory factors.

¶75 Here, there is not a reasonable likelihood that the jury read the instruction to preclude consideration of whether Davis suffered from a major mental illness. The express language of the instruction defined "mitigating circumstance" in broad terms and went on to say the jury should consider "*any other factors* concerning the offense or the defendant that you find to be relevant, *including, but not limited to,* the following." CP at 1165 (emphasis added). *Gentry* establishes that the instruction given here not only conformed with the constitutional requirement that the jury be allowed to consider all relevant mitigating circumstances, but also followed the preferred practice in Washington State by enumerating statutory but not nonstatutory mitigating factors.

## 6. Did the deputy prosecutor's comments prejudice Davis's right to a fair trial?

¶76 Davis contends that several aspects of the prosecutor's closing argument constituted misconduct, denying Davis his constitutional rights to have the jury consider all mitigating evidence and to a fair trial. In particular, Davis assigns error to the prosecutor's (1) comments about compassion; (2) allegedly inflammatory remarks, including the re-creation of a possible dialogue between Davis and Couch during the rape and murder; (3) statement "If not now, then when? And, if not Cecil Davis, then who[ ]?"; and (4) comments on whether Davis's actions showed remorse. He asserts, additionally, that even if these instances of alleged misconduct alone do not support reversal, collectively they do. RP (May 15, 2007) at 3495.

¶77 To make a successful claim of prosecutor misconduct, the defense must establish that the prosecuting attorney's conduct was both improper and prejudicial. *State v. Yates,* 161 Wn.2d 714, 774, 168 P.3d 359 (2007); *State v. Hoffman,* 116 Wn.2d 51, 93, 804 P.2d 577 (1991). Conduct is

improper if, for example, it encourages the jury to make a decision based on passion or prejudice, or if it refers to matters outside the record. *See State v. Belgarde*, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988). To be prejudicial, a substantial likelihood must exist that the misconduct affected the jury's verdict. *Yates*, 161 Wn.2d at 774. Prejudicial effect must be judged by viewing the improper comments in context of the penalty phase as a whole, not in isolation. *Id.*

¶78 If the defense does not object at trial, "[r]eversal is not required if the error could have been obviated by a curative instruction which the defense did not request." *Hoffman*, 116 Wn.2d at 93. Failure to object to an allegedly improper remark constitutes waiver unless the remark is "so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *Stenson*, 132 Wn.2d at 719 (citing *Gentry*, 125 Wn.2d at 596). If the defense does object to a prosecutor's comment, we review the trial court's ruling on the objection for abuse of discretion. *Id.* at 718. This standard of review recognizes that the trial court is in the best position to determine whether prosecutorial misconduct actually prejudiced the defendant's right to a fair trial. *Id.* at 718-19.

### Comments about compassion

¶79 Before closing argument took place, the jury was instructed that a mitigating circumstance was "a fact about either the offense or about the defendant which in fairness *or in mercy* may be considered as extenuating." CP at 1165 (emphasis added); RP (May 15, 2007) at 3490. The jury was also instructed that "[t]hroughout your deliberations you must not be influenced by passion, prejudice or sympathy. *You may find mercy for the defendant to be a mitigating circumstance.*" CP at 1159 (emphasis added); RP (May 15, 2007) at 3486.

¶80 In closing argument, the prosecutor said:

> Compassion is an emotion. Emotion is forbidden from play-
> ing a part in your decision in this case. When you look through
> those jury instructions—you each have a copy of them and you
> are going to get the originals—you can look through them as
> many times as you want and you will not see the word
> "compassion" anywhere. You will see the word "emotion." "Your
> verdict must be based upon reason and not emotion. You must
> not be influenced by passion, prejudice, or sympathy." Quite
> frankly, you must not be influenced by compassion, prejudice or
> sympathy.
>
> We tell you to check those things at the door. Don't bring in
> your anger at this defendant and sentence him to death
> because of it. Don't bring in your sympathy and compassion
> and sentence him to life because of it.
>
> You should keep the compassion in this case where it
> belongs. Feel sorry for Mrs. Couch. Feel sorry for her family.
> Feel sorry for the defendant's family. None of them did any-
> thing to deserve to be here involved in this case. Do not feel
> sorry for this defendant, because he is about to get a sentence,
> a penalty, that he richly deserves.
>
> But, by the same token, you cannot let that emotion be the
> reason for your decision. When you sentence this defendant to
> death, it must be for the right reasons, and those reasons are
> the evidence and the law.

RP (May 15, 2007) at 3505-06. A summary of the prosecu-
tor's comments regarding compassion was displayed to the
jury in PowerPoint slides. Defense counsel did not object to
this argument.

¶81 Davis argues these comments prohibited the jury
from considering mercy and that this violated his Eighth
and Fourteenth Amendment rights to have the jury con-
sider all relevant mitigating circumstances. In particular,
he contends that because the dictionary definition of
"mercy" includes the word "compassion" and because the
two terms have been historically associated, the prosecu-
tor's closing argument improperly forbade the jury from
considering mercy.

¶82 Even if the jury is required to be permitted to consider mercy,[20] the prosecutor's argument did not foreclose the jury from doing so. The law draws a thin line between sympathy, which is based on a purely emotional response and may not be considered by a capital sentencing jury, and mercy, which is a reasoned moral response to evidence that the jury may take into account. *Gentry*, 125 Wn.2d at 648; *In re Pers. Restraint of Rupe*, 115 Wn.2d 379, 395-96, 798 P.2d 780 (1990). Contrary to Davis's argument, the dictionary does not link "compassion" only to "mercy"; "compassion" is listed also as a synonym for "sympathy." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1413, 2317 (2002). Similarly, a historical association between mercy and compassion does not establish that compassion cannot also be thought of as an emotional, sympathetic response. The decisive factor is the context of the prosecutor's argument, which consistently described compassion as an unreasoned, sympathetic response, not a reasoned, merciful one. *E.g.*, RP (May 15, 2007) at 3505 ("Compassion is an emotion. Emotion is forbidden from playing a part in your decision."), 3506 ("[Y]ou cannot let that emotion [(compassion for Couch)] be the reason for your decision."). The jury instructions twice listed mercy as a relevant mitigating factor, and on at least five occasions, defense counsel emphasized the jury's ability to grant mercy. *See* Appellant's Opening Br. at 84-85. Viewing the prosecutor's remarks in the context of the penalty phase as a whole, it is unreasonable to conclude the jury would have felt barred

---

[20] Davis argues the jury, constitutionally, must be permitted to consider mercy based on the general directive in *Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) and *Lockett*, 438 U.S. 586, that the jury must give individualized consideration to each defendant, including consideration of all relevant mitigating facts about the defendant's character, record, or the circumstances of the offense. While we have held that the jury may consider mercy, we have never held that its consideration is constitutionally mandated. *See, e.g.*, *Gentry*, 125 Wn.2d at 647-48 (instruction allowing jury to consider fairness or mercy was permissible because mercy, unlike sympathy, is based in reason). Here, because the prosecutor's closing argument did not preclude the jury from considering mercy, we need not reach the issue of whether the federal or state constitutions require such consideration.

from considering mercy. Instead, jurors would have felt barred from making a decision based on pure emotion—whether that emotion is labeled as sympathy or compassion—which is exactly what the law requires.

¶83 Furthermore, there is no indication that the prosecutor's remarks about compassion were flagrant and ill intentioned. To the contrary, the prosecutor's argument revealed an intent to comply with the law by emphasizing that the jury should base its decision not on emotion, but on the evidence and reason. Even assuming the prosecutor went too far, a jury instruction clarifying the definition of compassion could have cured any error.

*Inflammatory remarks and facts not in evidence*

¶84 Davis argues that several elements of the prosecutor's closing argument played on jurors' passions and argued facts not in evidence. In particular, Davis identifies the following remarks as problematic:

¶85 1. The prosecutor's description of the bathtub as Couch's "death chamber." RP (May 15, 2007) at 3512.

¶86 2. The prosecutor's remarks encouraging the jurors to imagine Couch's final hour and what she must have said to Davis. For example, the prosecutor said when Davis entered the home, "[Y]ou can be sure that [Couch's] first reaction was, 'Get out of my house. What are you doing in my house? What do you think you're doing?' Or anything along those lines." RP (May 15, 2007) at 3536. The prosecutor continued by saying that the moment when Davis started beating and rubbing on Couch was "probably when [she] started to beg. Maybe she changed her attitude about 'get out of my house,' and at that point she was telling Cecil Davis, 'Leave me alone. Take whatever you want. Take anything you want, just leave me alone, leave my house.' " *Id.* The description continued with more possible statements that Couch made.

¶87 3. The prosecutor's discussion of mercy at the end of the same description of the crime:

What mercy did the defendant show Mrs. Couch?

And then he dragged her to the bathroom and he sat her on that bathtub. Maybe he told her, "You know what, cooperate with me here and I'll let you live," because you know that Mrs. Couch wasn't going into that tub and going to her death quietly or voluntarily. And you can be sure that she was screaming and fighting and begging. And, who knows, maybe Mrs. Couch even said, "Have mercy on me." And what mercy did the defendant show her? He filled the bathtub with cold water. He forced her into that tub. He poured toxic chemicals on a rag. He put his hands around her throat, one of them at least, and then he put the other one on top of her face and he forced that rag against her nose and against her mouth. And as she struggled and fought just to breathe, she was rewarded with poisonous toxic chemicals. And you can be sure she wasn't quiet still, because you know that Mrs. Couch knew that she was very close to death. She had to give everything she could. And what mercy did the defendant show her?

Eventually, Mrs. Couch stopped struggling. And, eventually, she stopped breathing. And probably the most compelling thing about this case that can be said is that at that point Mrs. Couch finally got some relief, finally got some mercy, but it wasn't anything this defendant did. It wasn't anything that he should be rewarded for. And so, when you decide how much mercy or whether to show mercy to this defendant, you should consider those final few minutes of Yoshiko Couch's life on this earth.

*Id.* at 3538-39.

¶88 4. The prosecutor's comment that while Davis received constitutional rights such as representation by counsel, the right to confront witnesses, and an impartial jury in determining whether he would live or die, Couch received no due process while facing death: "The defendant was her judge, jury, and executioner; no due process, no trial, no chance to present mitigation." *Id.* at 3502.

¶89 5. Comments implying that Davis scrubbed Couch's vagina while she was alive, when the evidence did not show whether the scrubbing occurred while she was alive or

dead:[21] "[H]e put her in the bathtub, degraded her with no clothing on the bottom, scrubbed her vagina, and then he suffocated her." *Id.* at 3574.

¶90 6. The argument that Davis's background and psychological problems were not "true mitigation" but rather "excuse[s]." *Id.* at 3524.

¶91 The defense did not object to any of these remarks.

¶92 Davis bases much of his argument on *Urbin v. State*, 714 So. 2d 411, 421, 422 n.14 (Fla. 1998), a case in which the Florida Supreme Court held that a prosecutor committed misconduct during his closing argument when he put imaginary words in the victim's mouth (" 'Don't hurt me. . . .' "), argued that the jury should " 'show [the defendant] the same amount of pity that he showed [the victim] on September 1, 1995, and that was none,' " and labeled the defense's mitigation evidence as " 'excuses' " at least 11 times. *Urbin* is distinguishable because Florida law explicitly prohibited many of the comments at issue. It could be said, therefore, that the prosecutor's comments showed a flagrant disregard for precedent. *See id.* at 422 ("The fact that so many of these instances of misconduct are literally verbatim examples of conduct we have unambiguously prohibited in [several Florida cases] simply demonstrates that there are some who would ignore our warnings concerning the need for exemplary professional and ethical conduct in the courtroom."). In contrast, Washington law does not clearly prohibit a prosecutor from making the comments made in Davis's case.

¶93 Many of the remarks Davis identifies are proper. First, the description of the bathtub as Couch's "death chamber," while strong, is accurate and grounded in fact. *See* RP (May 1, 2007) at 2733-34 (medical examiner's

---

[21] Davis does not cite any part of the record indicating the scrubbing occurred after death rather than while she was alive. Rather, he claims simply that the record does not support that the scrubbing occurred while she was alive. The testimony of the medical examiner who performed the autopsy supports Davis's claim that the timing of the scrubbing is inconclusive.

testimony that Couch could have died in the bathtub). This comment did not incite the jury to make a decision based on improper grounds, but on a legitimate aggravating factor: the circumstances of the crime itself, and in particular, that Davis killed Couch by suffocating her with toxic chemicals in a bathtub. In contrast, see *Belgarde*, 110 Wn.2d at 506-08 (prosecutor's comments regarding the defendant's membership in the American Indian Movement were misconduct because they encouraged the jury to render a verdict based on that affiliation rather than the evidence).

¶94 Second, in Davis's first appeal, we rejected the argument that it was misconduct for the prosecutor to argue that the jury should show Davis the same amount of mercy that he showed Couch. *Davis*, 141 Wn.2d at 873. We also approved of the comment that Davis was Couch's " 'judge, jury and executioner.' " *Id*. (quoting RP at 2518-19). Davis's only new support for the argument that these comments were prosecutorial misconduct is that the Florida Supreme Court did so in *Urbin*. As discussed earlier, *Urbin* is distinguishable because the prosecutor's comments there were explicitly forbidden under Florida law. *Urbin*, 714 So. 2d at 422. We are not inclined to abandon our own directly binding precedent in favor of distinguishable, nonbinding authority.

¶95 Third, calling the defense's evidence "excuses" was proper because context shows this label was directed at the evidence's weight, not its relevance. Significantly, the deputy prosecutor began discussing Davis's mitigating evidence by reminding the jury that it should judge Davis's mitigating evidence in the same way it judged any other evidence. The deputy prosecutor then pointed out several weaknesses of the evidence, such as that Davis's brothers and sisters were not violent despite their similar upbringings; that the defense witnesses were not credible; and that "[t]he defendant says he hears voices, but they don't tell him to kill people. They don't tell him to rob or rape people." RP (May 15, 2007) at 3523. The prosecutor then summarized

these arguments by saying that the defendant's childhood and cognitive disorders were not true mitigation, but excuses. In this context, it is clear that there was no attempt to foreclose Davis from raising these issues. Rather, the argument was that the jury should give them little weight.

¶96 Moreover, there is no indication that any of the foregoing comments were flagrant or ill intentioned, or that they could not have been cured by a jury instruction. In *Gregory*, 158 Wn.2d at 864-67, we held it was flagrant, ill-intentioned prosecutor misconduct to comment on prison life when the comments "blatantly violated" the trial court's order excluding such evidence.[22] Here, the deputy prosecutor's comments did not violate any of the trial court's evidentiary rulings and defense counsel did not indicate in any objections that the comments were inappropriate. To the extent they were, it is unclear why a limiting instruction could not have cured any damage.

¶97 The prosecutor's imagined dialogue between Couch and Davis during her rape and murder borders on improper. "In closing argument a prosecuting attorney has wide latitude in drawing and expressing reasonable inferences from the evidence." *Gentry*, 125 Wn.2d at 641. While it is reasonable to infer that Couch would have resisted Davis's assault, inventing actual dialogue stretches the idea of a reasonable inference to near its breaking point. However, because Davis did not object to this argument, the trial court did not have an opportunity to stop the prosecutor. As noted, reversal in such instances is warranted only if the prosecutor's remarks were flagrant or ill intentioned. The context of the argument indicates

---

[22] Neeb, the prosecutor found to have committed the misconduct in *Gregory*, was also a prosecutor in Davis's case. The defense writes that "prosecutor Neeb holds the distinction of the only Washington prosecutor to commit misconduct resulting in reversal of a death sentence" and suggests this is relevant to a finding of flagrance and ill intention. Reply Br. of Appellant at 38. This ad hominem attack against Neeb is inappropriate and irrelevant. The misconduct warranting reversal in *Gregory* is entirely different from the alleged misconduct in this case. *See Gregory*, 158 Wn.2d at 866.

that they were not. The deputy prosecutor began his re-creation of the crime by explaining that the jury should look beyond the sterilized, after-the-fact evidence to imagine the actual crime and actual pain:

[D]uring this trial you saw a videotape of the crime scene as it was found. You saw photographs of the crime scene . . . . [A]ll of that was done in a clinical setting. It is a controlled environment here. And, in fact, the videotape, the pictures, they're kind of like silent movies. What they don't really give you is what happened between the defendant and Mrs. Couch in the early morning hours of January 25th, 1997.

RP (May 15, 2007) at 3535. As he went on to describe the crime, he often prefaced Couch's imagined comments with qualifying language, such as "[m]aybe he told her" or "you can be sure that." RP (May 15, 2007) at 3538, 3536, 3537. While the better practice would be to not put words in Couch's mouth at all, it was the prosecutor's responsibility to aid the jury in comprehending the brutality of the crime. Given the argument's context, the imagined dialogue was not so flagrant or ill intentioned that reversal is warranted in the absence of an objection.

¶98 The only remaining comment that could be considered improper is the implication that Couch's vagina was scrubbed before death. Davis does not dispute that the evidence showed that he scrubbed Couch's vagina; he argues only that it was inconclusive whether the scrubbing occurred while she was alive. That being the case, we reject the suggestion that Davis was prejudiced in any way by this comment.

*"If not now, then when? And, if not Cecil Davis, then who?"*

¶99 In asking the jury to return a death penalty, the prosecutors asked the jurors during the opening statement and closing argument, "If not now, then when? And, if not Cecil Davis, then who[ ]?" RP (May 15, 2007) at 3495; RP (Apr. 27, 2007) at 2364. In both instances, the defense

objected. Davis asserts that this question improperly appealed to emotion and argued facts not in evidence by implying that Davis's crime was worse than other aggravated murders.

¶100 In *Gregory*, a prosecutor made nearly identical arguments for imposing the death penalty when he asked without objection, " 'If not now, then when? And if not Allen Gregory, then who[ ]?' " and referred to the defendant as " 'the worst of the worst.' " *Gregory*, 158 Wn.2d at 856 (alteration in original) (quoting murder case Verbatim Report of Proceedings at 7717), 857. While we did not directly address the "if not now, then when?" question, we held that the "worst of the worst" comment did not violate due process or constitute prosecutor misconduct. *Id*.

¶101 Similarly, the prosecutors here properly argued that the death penalty was appropriate in Davis's particular case. Both times when they asked, "If not now, then when?" it was in the context of arguing that the death penalty was appropriate given the circumstances of the crime and Davis's lengthy criminal history. The prosecutors never mentioned any other aggravated murders. Davis has not met his burden of showing impropriety, much less flagrance or ill intention.

*Comments on remorse*

¶102 The deputy prosecutor listed several actions of Davis's after the crime, asking, "Are those the actions of somebody who was remorseful?" RP (May 15, 2007) at 3569. Specifically, he noted that Davis stole Couch's wedding ring, money from her purse, and groceries from her kitchen; left her in the bathtub with her vagina exposed and rubbed her vagina with household cleanser and an abrasive pad to cover up the crime; said " '[t]hat bitch is next' " about a neighbor who was talking to police and pointing at his home; and told another inmate that he may have killed the "fucking old bitch," but he did not rape her. *Id*. at 3570. Each time the prosecutor asked if these actions showed remorse, the defense objected.

■ ¶103 Davis argues that these comments constitute improper commentary on his right to remain silent because evidence of remorse could have come only from Davis's testimony. This argument is without merit. Davis gives no explanation for why only words, and not actions, could show remorse, and common sense suggests the opposite. It is a well settled principle of criminal law that a person's state of mind may be inferred from his or her actions. *See* 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 5.2(f) at 357 (2d ed. 2003).[23] The fact that Davis burglarized Couch's home after raping and murdering her, for example, could logically lead the jury to infer that he was not focused on " 'a gnawing distress arising from a sense of guilt for past wrongs' " but, rather, on an attempt to profit from his crime. Appellant's Opening Br. at 100 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1921 (1993)). Many people other than Davis could, and did, testify to his acts after the crime. The prosecutor's question specifically directed the jury to consider whether Davis's "actions" showed remorse, not whether his words did. His failure to testify was never mentioned and was not implicated.

*Cumulative error*

¶104 Davis argues that even if no single comment of the prosecutors denied him a fair trial, the cumulative effect of the comments did. Davis has established that only two remarks were improper: the invented dialogue between Couch and Davis and the implication that Davis scrubbed Couch's vagina while she was alive. Since the latter comment is insignificant, as explained above, it adds little or

---

[23] LaFave writes:

"It is not always easy to prove at a later date the state of a man's mind at that particular earlier moment . . . . He does not often contemporaneously speak or write out his thoughts for others to hear or read. He will not generally admit later to having the intention which the crime requires. So of course his thoughts must be gathered from his words (if any) and actions in the light of all the surrounding circumstances. Naturally, what he does and what foreseeably results from his deeds have a bearing on what he may have had in his mind." 1 LAFAVE, *supra*, § 5.2(f) at 357.

nothing to the prejudice caused by the invented dialogue. Because the prejudice caused by the invented dialogue was tempered by its context, and because the impropriety was not flagrant or ill intentioned, it does not warrant reversal.

7. Does Davis's sentence violate the Eighth Amendment to the United States Constitution and article I, section 14 of the Washington Constitution?

¶105 Citing *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), Davis contends that Washington's death penalty violates the prohibition in the Eighth Amendment to the United States Constitution against "cruel and unusual punishment[ ]." Davis argues in support of this contention that the death penalty is inflicted arbitrarily on some defendants but not others. He also asserts that the death penalty, as applied to him, violates article I, section 14 of the Washington Constitution under the four factors set forth in *State v. Fain*, 94 Wn.2d 387, 617 P.2d 720 (1980).[24] Large parts of these arguments were stricken pursuant to previous orders of this court, and, thus, we address each argument in its stricken form.

*Federal constitutional claim*

 ¶106 Without the stricken appendices, little remains of Davis's federal constitutional challenge. What is left is an argument that Washington's death penalty violates the Eighth Amendment under *Furman* because "many of this state's most prolific killers are spared." Appellant's Opening Br. at 111. We recently rejected this argument in *State v. Cross*, 156 Wn.2d 580, 623-24, 132 P.3d 80 (2006), where we concluded that *Furman*'s prohibition against the arbitrary and capricious application of the death penalty was satisfied by the eight protections set forth in Washington's special sentencing proceeding statutes, chapter 10.95 RCW. We again rejected the argument in *Yates*, 161 Wn.2d

---

[24] Article I, section 14 states that "[e]xcessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted."

at 792. Today, we reaffirm the holdings of *Cross* and *Yates* that Washington's death penalty does not violate the Eighth Amendment.

### State constitutional claim

¶107 At trial, Davis brought two motions to dismiss, arguing that the death penalty was unconstitutional. His discussion of the Washington Constitution was limited to the following paragraphs in one of the motions:[25]

> Just as the Eighth Amendment to the federal constitution prohibits cruel and unusual punishment, [a]rticle I, section 14 of the Washington [C]onstitution prohibits "cruel punishment." In fact, the state constitutional prohibition is broader than its federal counterpart. *State v. Manussier*, 129 [Wn].2d 652, 921 P.2d 473 (1996).
>
> The standards of decency governing capital jurisprudence under our state constitution have evolved to prohibit the execution of an individual convicted of a single-victim murder. Because Mr. Davis falls into this category, this [c]ourt should dismiss the death penalty.

CP at 714-15. The balance of the motion was based on federal law and uncited statistics about the death penalty's imposition. The trial court's order denying that motion did not mention article I, section 14.

¶108 On appeal, Davis has developed a full-fledged article I, section 14 challenge based on the four factors in *Fain*, 94 Wn.2d 387. He supports this argument in part by statistics and data in appendices that we have stricken. Significantly, Davis has not assigned error to any of the findings or conclusions in the trial court's ruling denying his motion to dismiss.

¶109 The State argues that Davis's state constitutional claim is inadequately preserved for review under

---

[25] While the motion to dismiss also included the subheading "Relevant Sate [sic] Constitutional Considerations," that section did not analyze Washington constitutional law, but rather the execution trends in the country and in Washington State. CP at 719.

RAP 2.5. RAP 2.5(a) states that an appellate court "may refuse to review any claim of error which was not raised in the trial court." The purpose of this rule is to give the trial court a chance to correct the error and give the opposing party a chance to respond. 2A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RAP 2.5 author's cmt. 1, at 233 (7th ed. 2011).

¶110 Notwithstanding the general rule, a party may raise a "manifest error affecting a constitutional right" for the first time on appeal. RAP 2.5(a). To be manifest, an error must result in actual prejudice, that is, the asserted error must have had practical and identifiable consequences in the trial of the case. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)). "[T]o determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." *Id.* at 100. If the trial court could not have foreseen the potential error or the record on appeal does not contain sufficient facts to review the claim, the alleged error is not manifest.

¶111 We decline to review Davis's state constitutional argument because it is inadequately preserved under RAP 2.5. Davis's cursory discussion of article I, section 14 in his motion to dismiss is inadequate to raise the claim for purposes of RAP 2.5. Important to our decision is the fact that Davis's motion to dismiss did not mention *Fain*, the case around which Davis's argument here is based. Davis appears to concede that the issue was not raised because he does not assign error to the trial court's denial of his motion and he responds to the State's preservation argument only by arguing that the claim is manifest constitutional error, not by arguing that the error was raised at trial.

¶112 The claimed error is not manifest because the record is insufficient to review it. The statistics in Davis's motion to dismiss were not supported by any citations or

exhibits, and Davis did not attempt to rely on the motion to dismiss in his brief to this court. Rather, he attached new data in appendices, which we subsequently struck. The State did not present its own competing data, arguing that it should have had a chance to do so at the trial court level. *See* Br. of Resp't at 90 n.17 and accompanying text. Thus, we have a severe lack of information on the death penalty's implementation, which makes it difficult for us to perform any meaningful analysis of portions of Davis's claim, such as whether capital punishment serves the legislative goal of deterrence or what punishment Davis would receive in other jurisdictions for the same offense. At the trial court level, this lack of information meant the court could not have foreseen and corrected the error, and the State lacked sufficient notice to properly argue the issue.

8. Should Davis's sentence be reversed due to cumulative error?

¶113 Davis contends that cumulative error denied him a fair sentencing. The accumulation of errors may deny the defendant a fair trial and therefore warrant reversal even where each error standing alone would not. *State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984); *State v. Badda*, 63 Wn.2d 176, 183, 385 P.2d 859 (1963). Here, few errors occurred, and those that did were not so egregious or unduly prejudicial that they denied Davis a fair trial. " '[A] defendant is entitled to a fair trial but not a perfect one.' " *Brown v. United States*, 411 U.S. 223, 231, 93 S. Ct. 1565, 36 L. Ed. 2d 208 (1973) (alteration in original) (quoting *Bruton v. United States*, 391 U.S. 123, 135, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968)). Reversal due to the accumulation of errors discussed above is unwarranted.

9. Should Davis's death sentence be invalidated pursuant to the provisions of RCW 10.95.130?

¶114 RCW 10.95.130 requires that in addition to any appeal raised by the defendant, the Supreme Court must

determine whether (1) sufficient evidence justified the jury's finding that there were not sufficient mitigating circumstances to merit leniency; (2) the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; (3) the death sentence was brought about through passion or prejudice; and (4) the defendant has an intellectual disability.[26]

### Sufficiency of the evidence

¶115 The first statutory question we must consider is whether sufficient evidence justifies the jury's finding that, considering Davis's crime, there were not sufficient mitigating circumstances to merit leniency. RCW 10.95-.130(2)(a), .060(4). If we make a negative determination as to that question, the sentence of death shall be invalidated. RCW 10.95.140(1)(a). The test as to the sufficiency of the evidence is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify that conclusion beyond a reasonable doubt.' " *Yates*, 161 Wn.2d at 786 (quoting *State v. Brown*, 132 Wn.2d 529, 551, 940 P.2d 546 (1997)).

¶116 We upheld the evidence as sufficient in Davis's first sentencing hearing, concluding that a rational jury could find that Davis did not merit leniency when he presented mitigating evidence of a difficult childhood and low intelligence, but the crime was brutal and the victim's family testified to its lasting, traumatic impact. Although the evidence presented at Davis's second sentencing was largely the same, Davis now argues that it is insufficient to support the jury's verdict because his mental health declined between the two proceedings. Specifically, Davis's IQ

---

[26] RCW 10.95.030(2)(a) defines "intellectual disability" as, among other characteristics, requiring an IQ of 70 or below. The term "intellectual disability" replaced the term "mentally retarded," which was used until 2010. Laws of 2010, ch. 94, § 3. The purpose of the change in terminology was to use respectful language but not to change the substantive law. RCW 44.04.280(4).

declined from 81 at the first sentencing to 74, as measured by the State's expert, at the second sentencing. *See Davis*, 141 Wn.2d at 877; RP (May 10, 2007) at 3368. Additionally, Davis's diagnoses changed. At the first sentencing, experts opined that Davis suffered from a learning disability; impaired neuropsychological functioning; and antisocial, borderline, and "schizotypal personality disorders," while at the second sentencing, experts diagnosed him with a cognitive disorder not otherwise specified and major depression with psychotic features. *Davis*, 141 Wn.2d at 877; RP (May 9, 2007) at 3256. Finally, evidence of normal EEG test results was introduced at the first sentencing, while an EEG that showed slowing and disorganization in Davis's brain was introduced at the second sentencing. *Davis*, 141 Wn.2d at 877; RP (May 9, 2007) at 3216-17.

¶117 The evidence at Davis's second sentencing hearing, viewed in the light most favorable to the prosecution, is again sufficient to uphold the jury's finding that leniency was not merited. Despite the decline in Davis's mental health, no mental health professional opined that Davis was mentally retarded. Moreover, significant expert testimony tended to show that Davis's diminished mental capacity did not cause him to commit the crime. *E.g.*, RP (May 9, 2007) at 3291-92 (defense expert testimony that auditory hallucinations did not tell Davis to kill other people and that major depression did not cause Davis to commit the crime). The jury could have rationally determined that given the calculated, heinous nature of the crime, mental slowness and a difficult childhood did not warrant leniency.

*Proportionality*

¶118 The second question we must consider in our mandatory statutory review is whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). If we answer this question in the affirmative, the sentence of death must be

invalidated. RCW 10.95.140(1)(b). " '[S]imilar cases' " is defined as "cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120." RCW 10.95-.130(2)(b). In turn, RCW 10.95.120 requires trial judges to submit reports with information on the defendant, the victim, and the crime in all cases where the defendant is convicted of aggravated first degree murder. Accordingly, the statute instructs us to compare Davis's death sentence to the penalty imposed in all cases of aggravated first degree murder, regardless of whether the prosecutor pursued the death penalty or whether the fact finder returned a sentence of death or life imprisonment. We have described this review as comparing the case at bar to all "death eligible cases." *Cross*, 156 Wn.2d at 630.

¶119 In *Cross*, we explained that our goal in proportionality review is to ensure that the death penalty's imposition is not "freakish, wanton, or random[ ] and is not based on race or other suspect classifications." *Id*. We noted there that we must consider at least (1) the nature of the crime, (2) the aggravating circumstances, (3) the defendant's criminal history, and (4) the defendant's personal history, as well as any additional substantive challenges to the proportionality of the sentence. *Id*. at 630-31; *see also Pirtle*, 127 Wn.2d at 686.

¶120 After evaluating the four required factors, a five-justice majority concluded that the death penalty was proportional for Cross, a man who fatally stabbed his wife and two teenage stepdaughters and held his 13-year-old stepdaughter at knife point for hours. Regarding the nature of the crime, we observed that like in other death penalty cases, Cross's murders exhibited a "marked level of cruelty" and " 'involv[ed] substantial conscious suffering of the victim.' " *Cross*, 156 Wn.2d at 632 (internal quotation marks

omitted) (quoting *State v. Elledge*, 144 Wn.2d 62, 81, 26 P.3d 271 (2001)). We concluded that "[w]e cannot say the prosecutor's decision to prosecute, and the jury's decision to sentence, were disproportionate based on the nature of the crime." *Id.* The single aggravating factor, that the crime involved the murder of multiple victims as part of a common scheme or plan, did not weigh for or against proportionality. Cross had a single prior conviction, leading us to conclude that "[w]e cannot say, based on this, that the death penalty is disproportionate." *Id.* at 633. Similarly, we concluded that Cross's abusive childhood and personality disorders, which did not rise to the level of destroying competence, "d[id] not necessarily render a death penalty disproportionate." *Id.* at 634.

¶121 In *Yates*, we closely followed the reasoning of *Cross* and upheld the death sentence against a proportionality challenge. The record showed that the defendant, Yates, murdered two women by shooting them and encasing their heads in plastic bags. We noted the defendant's marked cruelty and one victim's conscious suffering; two aggravating factors of common scheme or plan and robbery; extensive criminal history, including 13 first degree murder convictions; and lack of a troubled upbringing or other mitigating circumstances. *Yates*, 161 Wn.2d at 789-91.

¶122 In Davis's first appeal, we said regarding the nature of the crime that " '[a] brutal murder involving substantial conscious suffering of the victim makes the murderer more deserving of the death penalty.' " *Davis*, 141 Wn.2d at 882 (quoting *Stenson*, 132 Wn.2d at 759); *Cross*, 156 Wn.2d at 632; *see also Yates*, 161 Wn.2d at 789 (discussing the victim's conscious suffering). Today, the same can be said about the brutal, cruel nature of Davis's crime and Couch's substantial conscious suffering. As we have observed above, Davis broke down the door of a 65-year-old woman's home, raped her to the point where her vagina ripped, strangled her, and left her to asphyxiate with chemical-soaked rags around her head in a bathtub filled

with blood and feces. Her disabled husband was downstairs, unable to resist or react. After committing this act of violence, Davis rifled through Couch's purse, and took cigarettes and items from her refrigerator. He also took the wedding ring off her hand and then offered to sell it to his mother.

¶123 Davis argues that the nature of this crime compared to similar cases should be evaluated differently than in 2000 because since then, this court has affirmed only three death sentences: one where the defendant requested the death penalty and two in which there were multiple victims. Appellant's Opening Br. at 144 (citing *Elledge*, 144 Wn.2d at 69-79; *Cross*, 156 Wn.2d at 592; *Yates*, 161 Wn.2d at 728-32). He argues, additionally, that it is freakish and wanton to impose the death penalty on him when many others who killed multiple victims, including Gary Ridgway with 48 murders, were given life imprisonment.

¶124 We have upheld death sentences for other defendants based on the aggravated murder of a single victim. *Elledge*, 144 Wn.2d 62; *Brown*, 132 Wn.2d 529; *Gentry*, 125 Wn.2d 570. In *Yates*, we held that the small number of victims (two) did not make the nature of the crime weigh toward finding the death penalty disproportionate when the defendant showed cruelty and at least one victim consciously suffered. Moreover, while we recognize that quantifying factors may be helpful in a proportionality review, we reject the premise that proportionality review is ultimately a "statistical task." *Pirtle*, 127 Wn.2d at 687. To make number of victims a determinative factor in whether the death penalty was proportionate would fail to capture the significance of Couch's pain and degradation, and Davis's callous indifference.

¶125 In both *Cross* and *Yates*, we directly addressed the fact that prosecutors did not seek the death penalty for Gary Ridgway, convicted of 48 murders, and found that it did not invalidate the death penalty in those cases on a disproportionate basis. In *Yates*, we wrote:

The effect of the Ridgway plea agreement on this court's proportionality review was an issue squarely before the court in *Cross*. There, the majority rejected the view that one prosecutor's discretionary decision could render chapter 10.95 RCW unconstitutional: "Ridgway's abhorrent killings, standing alone, do not render the death penalty unconstitutional or disproportionate. Our law is not so fragile."

*Yates*, 161 Wn.2d at 793 (quoting *Cross*, 156 Wn.2d at 624). Nothing about Ridgway's case that is relevant to proportionality has changed since we came to this conclusion four years ago. Under *Cross* and *Yates*, Ridgway's sentence remains an isolated incident that does not bear on whether imposition of a sentence of death in Davis's case is excessive or disproportionate.

¶126 Turning to aggravating factors, the jury in the guilt phase of Davis's trial found three such factors: the murder was committed in the course of or in furtherance of robbery, rape, and burglary. *Davis*, 141 Wn.2d at 882; *see also* CP at 1195. The jury at Davis's second penalty proceeding knew of these aggravators. *E.g.*, CP at 1161-62; RP (May 15, 2007) at 3487-88. In our opinion following Davis's appeal from his first death sentence, we indicated that three aggravators weighed in favor of proportionality because other defendants had been sentenced to death where only two or one aggravating factors were present. *Davis*, 141 Wn.2d at 883 n.449 (listing cases); *see also State v. Woods*, 143 Wn.2d 561, 617, 23 P.3d 1046 (2001) (three or more aggravating factors were present in only 21 percent of death eligible cases in 2001). This observation has strengthened with time, as the three defendants whose death sentences have been upheld since Davis's first appeal were all found to have fewer than three aggravators. *Yates*, 161 Wn.2d at 789-90 (two aggravators); *Cross*, 156 Wn.2d at 633 (one aggravator); *Elledge*, 144 Wn.2d at 81 (one aggravator).

¶127 The nature of the aggravating circumstances, as well as the number, is important to consider. *Cross*, 156 Wn.2d at 633. It is difficult to weigh the nature of aggra-

vating factors because they are, by definition, facts that make a murder particularly reprehensible. But it is safe to say that nothing about the nature of this rape, robbery, or burglary makes the death penalty disproportionate. The rape was particularly brutal, causing serious internal damage to Couch. The robbery of Couch's wedding band is particularly offensive because Davis had the callousness to look at her wounded or dead body and think of what more he could take, and because the object he took symbolizes an institution and commitment the courts have long revered and protected. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 12, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967) ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival." (quoting *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S. Ct. 1110, 86 L.Ed. 1655 (1942))). And the burglary of a few cheap items, like meat and cigarettes, suggests that the true purpose of Davis's crime was the harm inflicted rather than the goods gained.

¶128 Finally, Davis's extensive criminal history supports the proportionality of his sentence even more than it did in 2000. When Davis was originally sentenced to death, the jury learned that Davis had the following convictions:

> (1) robbery in the second degree in 1986, (2) perjury in the second degree in 1986, (3) assault in the fourth degree in 1988, (4) assault in the second degree in 1990, (5) criminal trespass in the first degree in 1990, (6) driving without a valid operator's license in 1992, (7) driving without a valid operator's license in 1993, (8) theft in the third degree in 1992, and (9) violation of a domestic violence pretrial no-contact order in 1995.

*Davis*, 141 Wn.2d at 883. We observed that this criminal history was "comparatively more extensive than that of other appellants who received the death penalty." *Id*.

¶129 In Davis's second sentencing hearing, the jury heard the same criminal history, plus an additional conviction of intentional murder in the second degree that was obtained in 2006. This additional murder conviction is significant because in *Yates*, we recognized that "Yates's

prior murder convictions place him in a unique category, since among those defendants included in the trial judge reports, only 13[27] had a prior conviction for murder or manslaughter." *Yates*, 161 Wn.2d at 790. It does not appear that this statistic has materially changed since *Yates*. Thus, Davis, like Yates, is in a special category of repeat murderers. Along with his extensive criminal history, this supports a finding of proportionality.

¶130 Finally, the personal history presented at Davis's second sentencing was largely the same as that presented in his first sentencing: a difficult childhood, low intelligence, and personality disorders. As explained in this court's analysis of sufficiency of the evidence, Davis's decline in mental health since 2000 does not change the fact that he is not intellectually disabled and there is no indication that mental illness caused him to rape, rob, burglarize, and murder Couch. None of the mitigating factors now renders the death penalty disproportionate.

¶131 The dissent opines that the imposition of the death penalty in the instant case is " 'excessive or disproportionate' " in comparison with the "dozens of life sentences imposed for aggravated murders similarly brutal to the one Cecil Emile Davis committed" and advocates remanding the case "for imposition of a sentence of life imprisonment without possibility of parole." Dissent at 375 (quoting RCW 10.95.130(2)(b)). Although the dissent purports to limit its reach to rejecting Davis's death sentence, the opinion strikes us as nothing less than a sweeping condemnation of Washington's death penalty regime, the dissent saying, "I cannot escape the truth about Washington's death penalty." *Id*. at 388. "One could better predict whether the death penalty will be imposed on Washington's most brutal murderers by flipping a coin than by evaluating the crime and the defendant." *Id*.

¶132 This denunciation of the death penalty's alleged "randomness" revives the proportionality challenge this

---

[27] Our review causes us to believe that this number should be 12.

court rejected in *Cross*, 156 Wn.2d 580, a decision the dissent mentions only in a footnote on an unrelated issue.[28] Indeed, its conclusion that "[o]ur system of imposing the death penalty defies rationality," dissent at 388, is highly reminiscent of the statement in the dissent in *Cross* that our proportionality review "defies rational explanation," and that the death penalty is "like lightning, randomly striking some defendants and not others." *Cross*, 156 Wn.2d at 652 (C. Johnson, J., dissenting).

¶133 The dissent embraces the standard expressed in a number of our past decisions that " ' "our duty" ' " under RCW 10.95.130(2)(b) is to ensure " ' "that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed *generally* and not wantonly and freakishly imposed." ' " Dissent at 376 (quoting *State v. Harris*, 106 Wn.2d 784, 798, 725 P.2d 975 (1986) (quoting *Moore v. State*, 233 Ga. 861, 213 S.E.2d 829 (1975) and citing *Brown*, 132 Wn.2d at 555; *State v. Benn*, 120 Wn.2d 631, 679, 845 P.2d 289 (1993)). Unfortunately, the dissent disregards the cautionary language contained in many of those same opinions that "[m]athematical precision is unworkable and unnecessary," *Brown*, 132 Wn.2d at 555 (footnote omitted), and that crimes " 'cannot be matched up like so many points on a graph.' " *Benn*, 120 Wn.2d at 680 (quoting *Lord*, 117 Wn.2d at 910).

¶134 In its effort to show that the "death penalty is not imposed generally in similar cases," dissent at 376, the dissent proceeds to list more than 40 murderers who received a sentence of life in prison instead of a death sentence for aggravated murders that it considers comparable to Davis's vicious slaying of Yoshiko Couch. *See id.* at 377-79. The dissent then observes that in contrast, "only 13 death sentences other than Davis's have been imposed for murders involving rape or sexual assault." *Id.* at 380. Since more murderers have "escaped death for crimes comparable

---

[28] The dissent also fails to acknowledge our opinion in *Yates*, 161 Wn.2d 714, reaffirming *Cross*.

to those that support death sentences," *id.* at 377, the dissent concludes that "[c]onsidering the crime and the defendant, it is impossible to predict whether a defendant convicted of a brutal aggravated murder will be sentenced to life in prison or death." *Id.* at 376-77.

¶135 Contrary to the dissent's assertion, these "dozens of life sentences" do not prove that Davis's death sentence is disproportionate, and they certainly do not show that Washington's system of imposing the death penalty "defies rationality." *Id.* at 375, 388. RCW 10.95.130(2)(b) directs courts to consider "both the crime *and the defendant.*" (Emphasis added.) In support of its position, the dissent has lined up dozens of gruesome aggravated murders that it suggests are similar to Cecil Davis's crime in that they involved rape or sexual assault; but while the dissent has considered the nature of the crime in compiling its list, it appears to us that the opinion does not give adequate consideration to the defendants and other relevant factors.[29] This is a significant flaw in the dissent's reasoning because we have said in prior cases that " '[s]imply comparing numbers of victims or other aggravating factors may superficially make two cases appear similar, where in fact there are mitigating circumstances in one case to explain either a jury's verdict not to impose the death penalty or a prosecutor's decision not to seek it.' " *Lord,* 117 Wn.2d at 910 (quoting *In re Pers. Restraint of*

---

[29] This is apparent from the start. The dissent leads off with Mario Ortiz, who had an IQ of 49 and had been enrolled "in special education" before he dropped out of school. Report of Trial Judge (TR) 1, at 2. Ortiz's IQ placed him "in the low mild or high moderate range of mental retardation." *Id.* at 3. Unlike Cecil Davis, Ortiz had no prior convictions. The dissent, nevertheless, submits Ortiz's life sentence as evidence that "[o]ur system of imposing the death penalty defies rationality." Dissent at 388. Today, the law prohibits the execution of a person who "had an intellectual disability at the time the crime was committed," meaning "(i) Significantly subaverage general intellectual functioning; (ii) existing concurrently with deficits in adaptive behavior; and (iii) both significantly subaverage general intellectual functioning and deficits in adaptive behavior were manifested during the developmental period." RCW 10.95.030(2)(a); *see also Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (executions of mentally retarded criminals "cruel and unusual punishments" prohibited by the Eighth Amendment to the United States Constitution).

*Jeffries*, 114 Wn.2d 485, 490, 789 P.2d 731 (1990)). The dissent might well have excluded many of the cases on its list based on a consideration of mitigating evidence, but it postpones its consideration of mitigating factors until after it has used its list of "dozens of life sentences" to suggest that Davis's death sentence is disproportionate. *See* dissent at 384-86.

¶136 One factor jurors are asked to consider is "[w]hether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity." RCW 10.95.070(1). While Cecil Davis had an extensive criminal record, including a prior intentional murder, at least nine of the defendants on the dissent's list of similar crimes had no criminal history.[30] Report of Trial Judge (TR) 1; TR 18; TR 50; TR 67; TR 109; TR 172; TR 207; TR 236; TR 245. Although this may help to explain why prosecutors decided not to seek the death penalty in those cases[31] or why the jury voted to spare the defendants' lives,[32] the dissent only discloses that fact belatedly. *See* dissent at 382-83.

¶137 The dissent, in our view, ignores other factors entirely. For instance, jurors are asked to consider "[w]hether the age of the defendant at the time of the crime calls for leniency." RCW 10.95.070(7). The dissent does not report that a number of the defendants on its list might have been spared the death penalty in part because of their age.[33] *See* TR 50 (16); TR 67 (16); TR 94 (20); TR 150 (19); TR 193 (20);

---

[30] The space provided for criminal history on TR 124, at 3 states "unknown," on TR 150, at 3 "N/A," and on TR 166, at 3 "not known."

[31] *See, e.g.*, TR 207, at 6 ("The prosecutor did not seek death penalty because of the defendant's relative youth (19 years of age at time of incident) and complete lack of criminal history.").

[32] *See, e.g.*, TR 50, at 13 ("The jury would have had a very difficult decision . . . . The prosecutor withdrew his request [for the death penalty] based on [the report of the State's] psychologist. The defendant's youth, and lack of any prior record were factors.").

[33] Notably, the United States Supreme Court has held that the execution of individuals who were under 18 years of age at the time of their crime is prohibited by the Eighth Amendment. *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

TR 207 (18). Nor does the dissent reveal that there was credible evidence in several of these cases that "at the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired as a result of mental disease or defect." RCW 10.95.070(6); *e.g.*, TR 8, at 3 (Clinical psychologist stated, " 'The pattern of [IQ] scores is uniformly depressed and would indicate an individual of marginal cognitive capacity. The IQ which is reported here falls in the borderline range of mental retardation.' "); TR 252, at 3 & Attach. A (defendant, whose competency was restored only after "an extensive period of hospitalization," had "a long history of mental illness, with several prior hospitalizations," and had been diagnosed with "schizo-affective disorder" by his psychiatrist, and "bipolar disorder, chronic severe with psychotic features" by both the defense expert and the evaluating psychologist from Western State Hospital); *see also* TR 1; TR 50; TR 56; TR 137; TR 185; TR 186.

¶138 Mitigating evidence is not the only reason a prosecutor might decide not to seek the death penalty. The strength of the State's case often influences that decision. For example, the trial judge's report regarding Martin Sanders states, "The plea agreement to recommend life without possibility of parole was due to the fact that the State felt there was a reasonable possibility of acquittal due to the circumstantial evidence available in the case." TR 81, at 6. The report goes on to reveal that the prosecutor consulted the victims' parents and the detectives in charge of the investigation. We learn from the report that the parents agreed to the plea because they did not want there to be "any chance" that the defendant might be set free by acquittal and "would have recommended life without the possibility of parole" at sentencing "in any event." *Id.* at 7. The detectives acknowledged the "appropriateness of this

plea" provided the defendant offer a full confession and agree to speak with authorities about an unsolved murder in that jurisdiction. *Id.* Similarly, the report concerning Jack Spillman relates that "the prosecution's case did not include direct evidence of [the] defendant's involvement in the murders," although there was "strong circumstantial evidence," and that "members of the victims' family spoke at the sentencing hearing in support of the life sentence and resolution of the case." TR 167, at 14.

¶139 Although these reports offer significant insight into the prosecutor's decision not to seek a death sentence or, in Spillman's case, to stipulate that it "could not prove beyond a reasonable doubt that there were not sufficient mitigating circumstances to merit leniency," TR 167, at 6, the dissent does not divulge this information. We merely learn from the dissent that "Martin Sanders raped two 14-year-old girls, beat one in the head with a tire jack, then strangled them," and that "Jack Spillman III repeatedly, fatally stabbed one woman and bludgeoned another, then sexually mutilated and eviscerated them." Dissent at 378-79. Unfortunately, a reader of the dissent would have no idea why the State did not seek the death penalty in those cases, the opinion essentially giving the reader no choice but to accept its suggestion that there was, in fact, *no* reason, and that the system simply doles out life and death on a random basis. The dissent claims that it "cannot escape" the conclusion that Washington's system of imposing the death penalty "defies rationality," but this conclusion is inescapable only because it fails to set forth adequately the reasons why persons convicted of crimes "similarly brutal to the one Cecil Emile Davis committed" received a sentence of life in prison instead of death.[34] *Id.* at 388, 375.

---

[34] We note that one of the defendants on the dissent's list was not even eligible for the death penalty, having murdered a young woman at a time when there was no valid death penalty statute on the books. *See* TR 100, at 7 ("death penalty was not a possibility"); *State v. Frampton*, 95 Wn.2d 469, 627 P.2d 922 (1981) (declaring death penalty statutes then in effect unconstitutional in light of *State v. Martin*,

¶140 The dissent's failure to convey adequately the reason a defendant received a life sentence instead of death is on full display when it turns from statistical analysis to a comparison of Cecil Davis's case with that of Gerald Davis. The dissent is obviously struck by the facial similarity of the two cases: two defendants with the same name, roughly the same age, guilty of equally hideous murders committed in the same county only days apart, yet one was sentenced to death and the other to life in prison—the quintessence of randomness! Or is it? The dissent does concede that "small differences can be found between Cecil Davis's and Gerald Davis's cases," but, ignoring the possibility that "small differences" might legitimately matter, concludes that "without invading the jury's role, it is hard to fathom why Cecil Davis was sentenced to death while Gerald Davis was sentenced to life imprisonment." Dissent at 386.

¶141 The dissent's argument that the system is plagued by randomness would have greater force if the same prosecutor had looked at similar aggravated murders committed by similar defendants and decided to seek the death penalty in one case but not the other.[35] That did not happen, and so Gerald Davis's fate was decided by a jury at a "[v]ery emotional" special sentencing proceeding where Gerald Davis's defense attorneys proffered evidence regarding his "[a]busive childhood, poverty, parental abandon-

94 Wn.2d 1, 614 P.2d 164 (1980), and *United States v. Jackson*, 390 U.S. 570, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968)).

[35] The prosecution sought the death penalty in nearly a third of the cases on the dissent's list. TR 2; TR 8; TR 36; TR 45; TR 50; TR 55; TR 56; TR 58; TR 100; TR 167; TR 184; TR 185; TR 186; TR 227. In one such case, 11 jurors voted in favor of a sentence of death, the lone dissenter informing his fellow jurors "that he had a strong philosophical opposition to the death penalty that he had not revealed during voir dire" and that "he would never vote to impose the death penalty." TR 45, at 13. In another case, the prosecution initially sought the death penalty, but the entire office was disqualified because the prosecutor had previously represented the defendant in an unrelated criminal matter. *See State v. Stenger*, 111 Wn.2d 516, 760 P.2d 357 (1988). The trial judge expressed his confidence that "had the trial proceeded in a normal manner, a jury may well have found death," but the "disqualification of the prosecutor by the State Supreme Court opinion gave rise to many significant legal problems to the special prosecutor." TR 55, at 14. The dissent does not reveal this information, instead expressing bewilderment that these defendants received life sentences.

ment, deficits in executive mental functions, [and] drug abuse." TR 186, at 15, 7. Upon receipt of this evidence, 10 jurors found no mitigating circumstances. Two jurors, however, found that there were mitigating circumstances that warranted leniency. That is why Gerald Davis "escaped death." Dissent at 377.

¶142 The fact that the life versus death decision in Gerald Davis's case came down in the end to the votes of two jurors is apparently unsatisfactory to the dissent, which would seemingly prefer a more predictable system. It is worth remembering, given the overriding importance the dissent attaches to predictability, that there was a time when the people of Washington voted to make the death penalty mandatory for aggravated murder. *See* former RCW 9A.32.046 (1975) (Initiative 316, § 2). At that time, it would have been possible to predict a defendant's sentence with perfect accuracy, but this court, in accordance with the United States Supreme Court's decision in *Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976), held that the mandatory imposition of the death penalty violated the Eighth Amendment to the United States Constitution. *State v. Green*, 91 Wn.2d 431, 446-47, 588 P.2d 1370 (1979), *adhered to in part on recons.*, 94 Wn.2d 216, 616 P.2d 628 (1980). We said it was " 'essential that the capital-sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense.' " *Id.* at 445 (quoting *Roberts v. Louisiana*, 431 U.S. 633, 637, 97 S. Ct. 1993, 52 L. Ed. 2d 637 (1977)). As a consequence, Gerald Davis was given the opportunity to present mitigating evidence to a jury, and two jurors voted to spare his life. As long as juries are asked to make individualized determinations concerning the appropriateness of the death penalty, as they must under *Green*, sentences will undoubtedly turn on the "small differences" between cases that the dissent's approach barely registers.

■■ ¶143 This court has said that "[p]roportionality review is not an inquiry into sentencing percentage com-

parisons," *State v. Benn*, 120 Wn.2d at 631, 690, 845 P.2d 289 (1993), but percentages are what the dissent features. The results of its analysis are that "over three times as many defendants received life sentences for aggravated murders involving sexual assault as were sentenced to death," that the "disparity in favor of life sentences increases to more than four-to-one when we consider cases where rape was found to be an aggravating factor," and that defendants with a criminal record "were still almost two and one-half times more likely to be sentenced to life in prison than sentenced to death." Dissent at 385-86. These results are not surprising or troubling.[36] We say that because the current system is designed to favor life sentences, the jury at a special sentencing proceeding being asked, " 'Having in mind the crime of which the defendant has been found guilty, are you convinced *beyond a reasonable doubt* that there are not sufficient mitigating circumstances to merit leniency?' " RCW 10.95.060(4) (emphasis added). The jury, moreover, must be unanimous in order to answer this question affirmatively, but not to answer negatively. *Id*. Thus, it takes only 1 juror with a reasonable doubt to bring about a life sentence, but 12 jurors to bring about a sentence of death.

¶144 The fact that more life sentences are imposed than death sentences does not prove that the system "defies rationality." Dissent at 388. In our view, it shows that the system is working as intended and that the different actors in the system are performing their assigned roles conscientiously—prosecutors in the exercise of discretion, jurors in considering mitigating evidence, and defense attorneys endeavoring to humanize defendants guilty of the most inhuman acts. While it is easy to imagine a system in which

---

[36] In a prior decision, this court observed that "[o]f the 145 persons convicted of aggravated first degree murder, only forty-one faced a special sentencing proceeding," and of those, "only sixteen were sentenced to death." *Pirtle*, 127 Wn.2d at 685, 686. The fact that life sentences far outnumbered death sentences did not prompt this court to conclude that our system of imposing the death penalty defied rationality. On the contrary, we assumed that prosecutors and jurors had acted properly in considering mitigating evidence. *See id*.

the death penalty is routinely sought and routinely imposed, that would not be a system superior to that extant in Washington and it would be inconsistent with the present values of our citizenry.

¶145 After endorsing the dissent's analysis of the death penalty's supposed "random and arbitrary nature," the justice specially concurring in dissent expresses his "deep concern that the death penalty might be much more predictable than we have recognized." Concurrence in dissent at 388-89. In this justice's view, the sentences that have been imposed in the last 30 years cannot be explained by aggravating and mitigating circumstances or other proper considerations, but can be explained by "the race of the defendant." *Id.* at 389. The justice asserts that "[a] review of the reports of prosecutions for aggravated first degree murder quickly discloses that African-American defendants are more likely to receive the death penalty than Caucasian defendants," attributing this "lopsided record" to attitudes about race "so deeply buried in our individual and collective unconscious that it is difficult to evaluate their effect on our judgments or the judgments of others." *Id.* at 389, 393, 390. While we address the justice's assertions at some length hereafter, we feel constrained to note that the issue was not raised by the defendant, Davis, despite the fact that he is represented by very able counsel, and the State, understandably, has not addressed the issue in its brief.

¶146 We begin with the observation that the likelihood of a white defendant receiving the death penalty in Washington is practically the same as the likelihood of a black defendant receiving it: 8[37] of the 57 cases[38] (14 percent) involving an eligible black defendant resulted in a sentence

---

[37] TR 29; TR 119; TR 135; TR 177; TR 180; TR 194; TR 216; TR 281.

[38] TR 12; TR 19; TR 24; TR 29; TR 33; TR 38; TR 77; TR 79; TR 83; TR 85, 85A; TR 88; TR 90; TR 91; TR 97, 97A; TR 102; TR 103; TR 105; TR 109; TR 110; TR 111; TR 119; TR 120; TR 126; TR 130; TR 131; TR 135; TR 138; TR 139; TR 141; TR 157; TR 166; TR 172; TR 177; TR 180; TR 185; TR 186; TR 187; TR 193; TR 194; TR 198; TR 216; TR 240; TR 248; TR 250; TR 252; TR 271; TR 272; TR 278; TR 280; TR 281; TR 289; TR 294; TR 296; TR 297; TR 306; TR 307; TR 309.

of death, compared to 25[39] of the 184 cases[40] (14 percent) involving an eligible[41] white defendant.[42] This court needs no convincing that "[w]e cannot ignore whether the defendant's race becomes a significant factor in imposing the death penalty." *Id.* at 389. However, our review of prosecutions for aggravated first degree murders does not reveal that black defendants "have in fact been treated differently," *id.*at 390, and it certainly does not show that the "sentence

---

[39] TR 3; TR 7; TR 9; TR 15; TR 16A; TR 31; TR 39; TR 43; TR 47; TR 73; TR 75; TR 76; TR 125; TR 132; TR 140; TR 144; TR 154; TR 165; TR 175; TR 176; TR 181; TR 183; TR 220; TR 251; TR 303.

[40] TR 2; TR 3; TR 6; TR 7; TR 9; TR 10; TR 15; TR 16; TR 16A; TR 17; TR 18; TR 20; TR 21; TR 23; TR 25; TR 26; TR 27; TR 28; TR 30; TR 31; TR 32; TR 34; TR 34A; TR 35; TR 36; TR 37; TR 39; TR 40; TR 41; TR 42; TR 43; TR 44; TR 45; TR 46; TR 47; TR 48; TR 49; TR 50; TR 51; TR 52; TR 53; TR 54; TR 55; TR 56; TR 57; TR 58; TR 59; TR 60; TR 61; TR 62; TR 63; TR 64; TR 65; TR 66; TR 67; TR 68; TR 69; TR 73; TR 74; TR 75; TR 76; TR 78; TR 81; TR 84; TR 86; TR 87; TR 89; TR 92; TR 93; TR 94; TR 95; TR 96; TR 98; TR 99; TR 104; TR 106; TR 107; TR 108; TR 115; TR 116; TR 117; TR 118; TR 121; TR 122; TR 123; TR 124; TR 125; TR 127; TR 128; TR 129; TR 132; TR 133; TR 134; TR 136; TR 137; TR 140; TR 142; TR 144; TR 146; TR 148; TR 150; TR 151; TR 152; TR 153; TR 154; TR 155; TR 156; TR 159; TR 162; TR 163; TR 164; TR 165; TR 167; TR 168; TR 169; TR 173; TR 174; TR 175; TR 176; TR 178; TR 179; TR 181; TR 182; TR 183; TR 184; TR 190; TR 191; TR 192; TR 199; TR 200; TR 201; TR 202; TR 207; TR 213; TR 214; TR 215; TR 217; TR 218; TR 219; TR 220; TR 221; TR 225; TR 227; TR 231; TR 233; TR 234; TR 235; TR 236; TR 237; TR 238; TR 239; TR 242; TR 243; TR 245; TR 251; TR 253; TR 254; TR 255; TR 257; TR 258; TR 259; TR 260; TR 261; TR 262; TR 263; TR 264; TR 265; TR 268; TR 269; TR 275; TR 276; TR 277; TR 279; TR 283; TR 284; TR 287; TR 288; TR 291; TR 293; TR 295; TR 298; TR 302; TR 303; TR 308. This includes a number of cases in which the State decided not to seek the death penalty in a second trial or sentencing proceeding after a defendant's death sentence was overturned on appellate or collateral review. *See* TR 47, 259 (Brian Lord); TR 75, 263 (Gary Benn); TR 125, 200 (James Brett); TR 132, 262 (Blake Pirtle); TR 175, 277 (Richard Clark).

[41] We exclude TR 100, at 7 ("death penalty was not a possibility"). The defendant, Michael Hightower, raped and murdered a 19-year-old woman on May 2, 1981, less than a month after this court's decision in *Frampton* (April 16, 1981) holding the death penalty statutes then in effect unconstitutional, and 12 days before the effective date of Laws of 1981, ch. 138, amending those statutes.

[42] We count TR 9 (Charles Campbell), TR 42 (Kenneth Petersen), TR 60 (Susan Kroll), TR 181 (Henry Marshall), TR 258 (Barbara Opel), TR 261 (Donovan Allen), and TR 268 (Donald Durga) as white because their judges regarded them as white and indicated that no evidence of their ancestry was presented to the jury. *Compare* TR 9, at 13 ("Notwithstanding the trace of Hawaiian descent, I would regard Mr. Campbell as being of the white race."), *with* TR 8, at 13 ("There was evidence of the defendant's Native American background.").

of death" in this case is "excessive or disproportionate to the penalty imposed in similar cases." RCW 10.95.130(2)(b).

¶147 This is not the first time that this court has considered the allegation that the death penalty is imposed in Washington on the basis of race.[43] In *Gentry*, 125 Wn.2d at 655, we said that

> there is no evidence that race was a motivating factor for the jury, and contrary to the Defendant's suggestion, a review of the first degree aggravated murder cases in Washington does not reveal a pattern of imposition of the death penalty based upon the race of the defendant or the victim.

The few statistics set forth in the concurrence in dissent do not convince us that our conclusion in *Gentry* was wrong or that the situation has since deteriorated.

¶148 The concurrence in dissent begins its analysis with the "73 aggravated first degree murder cases in which the prosecution sought the death penalty against African-Americans or Caucasians."[44] Concurrence in dissent at 390 (foot-

---

[43] It is, however, the first time this court has addressed the issue when it was not raised by the petitioner or briefed by the parties. We do so in order to respond to the suggestion that we have allowed racial discrimination to "pervade the imposition of capital punishment in Washington" by allowing proportionality review to become an " ' "empty ritual." ' " Concurrence in dissent at 398 (quoting dissent at 388 (quoting *Benn*, 120 Wn.2d at 709 (Utter, J., dissenting))).

[44] (Footnote omitted.) TR 2; TR 3; TR 7; TR 9; TR 15; TR 16A; TR 20; TR 23; TR 25; TR 26; TR 29; TR 31; TR 34; TR 34A; TR 36; TR 39; TR 42; TR 43; TR 44; TR 45; TR 47; TR 48; TR 50; TR 51; TR 52; TR 53; TR 56; TR 58; TR 60; TR 62; TR 63; TR 64; TR 65; TR 66; TR 73; TR 75; TR 76; TR 77; TR 86; TR 88; TR 92; TR 93; TR 95; TR 119; TR 125; TR 132; TR 135; TR 140; TR 144; TR 154; TR 157; TR 164; TR 165; TR 167; TR 174; TR 175; TR 176; TR 177; TR 180; TR 181; TR 182; TR 183; TR 184; TR 185; TR 186; TR 190; TR 194; TR 216; TR 220; TR 227; TR 251; TR 258; TR 281; TR 303. The concurrence in dissent excludes TR 16A (Nedley Norman). We see no reason to do so. RCW 10.95.130(2)(b) defines " 'similar cases' " as "cases reported in the Washington Reports . . . since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120." TR 16A qualifies, the case having been "reported in the Washington Reports . . . since January 1, 1965." *See Frampton*, 95 Wn.2d at 472 ("Nedley Norman, Jr., Howard Foren, Michael Robtoy, Floyd William Marr, and Morris Frampton are here on appeal from first degree murder convictions and sentences of death imposed after sentencing hearings held pursuant to RCW 10.94.020."). Thus, we include 74 cases in our analysis.

note omitted). Observing that 8 of the 13 black defendants were sentenced to death, compared to 24 of the 60 white defendants, it concludes that "African-Americans were much more likely than Caucasians to be sentenced to death (62 percent versus 40 percent)."[45] *Id.* at 391. The decision, however, to begin with the cases in which the prosecution sought the death penalty leads the concurrence in dissent to overlook the fact that the prosecution has done so far more often when the defendant was white than when the defendant was black, with the result that the pool of black defendants who faced a special sentencing proceeding is not only small but disproportionately small.

¶149 All told, the State has sought the death penalty in 61[46] of the 184 cases (33 percent) involving an eligible white defendant, but only 13[47] of the 57 cases (23 percent) involving an eligible black defendant. That fact alone should be sufficient to refute the notion that attitudes about race have led prosecutors to discriminate against black defendants in capital cases. Only by ignoring the large majority of black defendants who received a life sentence as a result of the prosecution's decision not to pursue the death penalty can it be said that black defendants have been "disproportionately sentenced to death." *Id.* at 393.

¶150 The concurrence in dissent fails to consider whether the "disproportionate number of African-Americans sentenced to death" at a special sentencing proceeding

---

[45] Including TR 16A, it is 25 out of 61 white defendants (41 percent): TR 3; TR 7; TR 9; TR 15; TR 16A; TR 31; TR 39; TR 43; TR 47; TR 73; TR 75; TR 76; TR 125; TR 132; TR 140; TR 144; TR 154; TR 165; TR 175; TR 176; TR 181; TR 183; TR 220; TR 251; TR 303.

[46] TR 2; TR 3; TR 7; TR 9; TR 15; TR 16A; TR 20; TR 23; TR 25; TR 26; TR 31; TR 34; TR 34A; TR 36; TR 39; TR 42; TR 43; TR 44; TR 45; TR 47; TR 48; TR 50; TR 51; TR 52; TR 53; TR 56; TR 58; TR 60; TR 62; TR 63; TR 64; TR 65; TR 66; TR 73; TR 75; TR 76; TR 86; TR 92; TR 93; TR 95; TR 125; TR 132; TR 140; TR 144; TR 154; TR 164; TR 165; TR 167; TR 174; TR 175; TR 176; TR 181; TR 182; TR 183; TR 184; TR 190; TR 220; TR 227; TR 251; TR 258; TR 303.

[47] TR 29; TR 77; TR 88; TR 119; TR 135; TR 157; TR 177; TR 180; TR 185; TR 186; TR 194; TR 216; TR 281.

is related to the disproportionately low number of black defendants who actually faced such a proceeding.[48] *Id.* at 389. Given that nearly five times as many white defendants have faced a special sentencing proceeding, it is not surprising that a number of life sentences have resulted from circumstances unlike those in any of the 13 cases involving a black defendant. To take some of the most obvious examples, three white defendants received a life sentence after the prosecution stipulated that mitigating circumstances merited leniency. *See* TR 92; TR 167; TR 182.[49] In a case involving a 16-year-old who shot and killed his family, the State withdrew its request for the death penalty based on the report of the State's own psychologist indicating that the defendant was " 'highly disturbed.' " TR 50, at 3.[50] In another case, the prosecution ultimately recommended a life sentence. *See* TR 52.[51] The life sentences imposed in these cases obviously had nothing to do with the judge's or jurors' attitudes about race. Indeed, by stipulating that mitigating evidence merited leniency, the prosecution gave the fact finders no alternative. The 13 cases in which the

---

[48] In criticizing our analysis of the results of special sentencing proceedings over time, the concurrence in dissent acknowledges that the number of black defendants who faced such a proceeding is "small," so small in fact "that a small adjustment in the time periods can give rise to wide variations." Concurrence in dissent at 393.

[49] *Cf.* TR 224 (prosecution stipulates that mitigating circumstances exist in a case involving a Mexican defendant with a sub-70 IQ who pleaded guilty to shooting a state patrol trooper).

[50] The trial judge observed, "The jury would have had a very difficult decision as to whether or not death should be imposed. The prosecutor withdrew his request based on his psychologist. The defendant's youth, and lack of any prior record[,] were factors." TR 50, at 13.

[51] Notably, the defendant was 18 and presented evidence of "extreme mental disturbance." TR 42, at 6. The trial judge remarked that "the sentence seemed appropriate to the crime, and the factors in mitigation. The sheriff, the prosecutor and the family of the victim were in agreement with the deputy prosecuting attorney's recommendation of life without possibility of release or parole." *Id.* at 13.

prosecution sought the death penalty against a black defendant do not include any comparable situations.[52]

¶151 The concurrence in dissent also fails to consider the results of special sentencing proceedings over time. The reports filed under RCW 10.95.120 between 1981 and 1991 reveal that prosecutors sought the death penalty in only 4[53] of the 22 cases[54] (18 percent) involving an eligible black defendant, resulting in two death sentences (50 percent).[55] Meanwhile, prosecutors sought the death penalty in nearly half of the cases, 40[56] out of 82[57] (49 percent), involving an eligible white defendant, resulting in 12 death sentences (30 percent).[58] In the next 20 years, however, the State sought the death penalty in only 21[59] of the 102 cases[60] (21 percent) involving an eligible white defendant, resulting in

---

[52] There is also no case of juror nullification comparable to TR 45 (James Dykgraaf). TR 45, at 13 (The jury voted 11-1 for death, the "lone dissenting juror" indicating that "he had a strong philosophical opposition to the death penalty that he had not revealed during voir dire" and that "he would never vote to impose the death penalty.").

[53] TR 29; TR 77; TR 88; TR 119.

[54] TR 12; TR 19; TR 24; TR 29; TR 33; TR 38; TR 77; TR 79; TR 83; TR 85, 85A; TR 88; TR 90; TR 91; TR 97, 97A; TR 102; TR 103; TR 105; TR 109; TR 110; TR 111; TR 119; TR 120.

[55] TR 29; TR 119.

[56] TR 2; TR 3; TR 7; TR 9; TR 15; TR 16A; TR 20; TR 23; TR 25; TR 26; TR 31; TR 34; TR 34A; TR 36; TR 39; TR 42; TR 43; TR 44; TR 45; TR 47; TR 48; TR 50; TR 51; TR 52; TR 53; TR 56; TR 58; TR 60; TR 62; TR 63; TR 64; TR 65; TR 66; TR 73; TR 75; TR 76; TR 86; TR 92; TR 93; TR 95.

[57] TR 2; TR 3; TR 6; TR 7; TR 9; TR 10; TR 15; TR 16; TR 16A; TR 17; TR 18; TR 20; TR 21; TR 23; TR 25; TR 26; TR 27; TR 28; TR 30; TR 31; TR 32; TR 34; TR 34A; TR 35; TR 36; TR 37; TR 39; TR 40; TR 41; TR 42; TR 43; TR 44; TR 45; TR 46; TR 47; TR 48; TR 49; TR 50; TR 51; TR 52; TR 53; TR 54; TR 55; TR 56; TR 57; TR 58; TR 59; TR 60; TR 61; TR 62; TR 63; TR 64; TR 65; TR 66; TR 67; TR 68; TR 69; TR 73; TR 74; TR 75; TR 76; TR 78; TR 81; TR 84; TR 86; TR 87; TR 89; TR 92; TR 93; TR 94; TR 95; TR 96; TR 98; TR 99; TR 104; TR 106; TR 107; TR 108; TR 115; TR 116; TR 117; TR 118.

[58] TR 3; TR 7; TR 9; TR 15; TR 16A; TR 31; TR 39; TR 43; TR 47; TR 73; TR 75; TR 76.

[59] TR 125; TR 132; TR 140; TR 144; TR 154; TR 164; TR 165; TR 167; TR 174; TR 175; TR 176; TR 181; TR 182; TR 183; TR 184; TR 190; TR 220; TR 227; TR 251; TR 258; TR 303.

13 death sentences[61] (62 percent).[62] In comparison, the State sought the death penalty in 9[63] of the 35 cases[64] involving a black defendant (26 percent), resulting in 6 death sentences (67 percent),[65] 2 of which were imposed on Cecil Davis. Thus, for two decades, the percentage of white defendants sentenced to death at a special sentencing proceeding has been basically the same as the percentage of black defendants sentenced to death.[66] Furthermore, as we have already observed, the overall percentage of black defendants sentenced to death is virtually identical to the

---

[60] TR 121; TR 122; TR 123; TR 124; TR 125; TR 127; TR 128; TR 129; TR 132; TR 133; TR 134; TR 136; TR 137; TR 140; TR 142; TR 144; TR 146; TR 148; TR 150; TR 151; TR 152; TR 153; TR 154; TR 155; TR 156; TR 159; TR 162; TR 163; TR 164; TR 165; TR 167; TR 168; TR 169; TR 173; TR 174; TR 175; TR 176; TR 178; TR 179; TR 181; TR 182; TR 183; TR 184; TR 190; TR 191; TR 192; TR 199; TR 200; TR 201; TR 202; TR 207; TR 213; TR 214; TR 215; TR 217; TR 218; TR 219; TR 220; TR 221; TR 225; TR 227; TR 231; TR 233; TR 234; TR 235; TR 236; TR 237; TR 238; TR 239; TR 242; TR 243; TR 245; TR 251; TR 253; TR 254; TR 255; TR 257; TR 258; TR 259; TR 260; TR 261; TR 262; TR 263; TR 264; TR 265; TR 268; TR 269; TR 275; TR 276; TR 277; TR 279; TR 283; TR 284; TR 287; TR 288; TR 291; TR 293; TR 295; TR 298; TR 302; TR 303; TR 308.

[61] TR 125; TR 132; TR 140; TR 144; TR 154; TR 165; TR 175; TR 176; TR 181; TR 183; TR 220; TR 251; TR 303.

[62] Notably, the increase in the percentage of white defendants sentenced to death is offset by the sheer number of white defendants who faced a special sentencing proceeding between 1981 and 1991.

[63] TR 135; TR 157; TR 177; TR 180; TR 185; TR 186; TR 194; TR 216; TR 281.

[64] TR 126; TR 130; TR 131; TR 135; TR 138; TR 139; TR 141; TR 157; TR 166; TR 172; TR 177; TR 180; TR 185; TR 186; TR 187; TR 193; TR 194; TR 198; TR 216; TR 240; TR 248; TR 250; TR 252; TR 271; TR 272; TR 278; TR 280; TR 281; TR 289; TR 294; TR 296; TR 297; TR 306; TR 307; TR 309.

[65] TR 135; TR 177; TR 180; TR 194; TR 216; TR 281.

[66] The concurrence in dissent dismisses as "arbitrary" our comparison of "aggravated first degree murder cases [in] two time periods: 1981 to 1991 compared to 1991 to 2011." Concurrence in dissent at 392-93. This division is suggested by the fact that nearly two-thirds of the reported cases (40 out of 61) in which the prosecution sought the death penalty against a white defendant occurred in the first decade after the death penalty was reinstated. It is apparent that the State became much more selective in the succeeding decades, and, not surprisingly, the proportion of white defendants sentenced to death at special sentencing proceedings increased significantly. The point is that when the State seeks the death penalty against white and black defendants in the same proportion, juries return verdicts of death in approximately the same percentage of cases.

percentage of white defendants sentenced to death (14 percent).[67] In our judgment, the record is not "lopsided," as the concurrence in dissent suggests. Concurrence in dissent at 393.

¶152 The concurrence in dissent states that "if the death penalty were color blind, one would expect to find that as a group, African-American defendants' crimes and past histories made them considerably more deserving of the death sentence than Caucasian defendants" but that "the trial reports contradict this expectation." *Id.* at 391. Our colleague claims, "When we consider *key statistics* for all African-Americans and Caucasians sentenced to death, it appears that African-American murder defendants as a group were no worse than Caucasian murder defendants." *Id.* (emphasis added). Mitigating evidence is certainly a "key statistic," perhaps *the* key statistic, jurors at a special sentencing proceeding being asked whether they are " 'convinced beyond a reasonable doubt that there are not sufficient *mitigating circumstances* to merit leniency.' " RCW 10.95.060(4) (emphasis added). In that regard, it is important to note that "African-American murder defendants as a group" presented significantly fewer mitigating circumstances,[68] averaging 1.2,[69] compared to 1.7[70] for "Caucasian murder defendants." Concurrence in dissent at 391. Not

---

[67] The concurrence in dissent says that this is a "false comparison" because it includes "defendants against whom the prosecution has not chosen to seek the death penalty." Concurrence in dissent at 392. We believe it is incorrect to disregard the large majority of black defendants convicted of aggravated first degree murder when evaluating the "danger that the death penalty might not be imposed in a fair, equal, or just manner." *Id.* at 393.

[68] Reports filed under RCW 10.95.120(3) contain two questions regarding mitigating circumstances:

"(c) Was there, in the court's opinion, credible evidence of any mitigating circumstances as provided in Laws of 1981, ch. 138, § 7? . . .

"(d) Was there evidence of mitigating circumstances, whether or not of a type listed in Laws of 1981, ch. 138, § 7, not described in answer to (3)(c) above?" *E.g.*, TR 29, at 6-7; *see* RCW 10.95.120(3)(c), (d). It is relatively simple to assign a numerical value to judges' answers to (3)(c). Answers to (3)(d) are more difficult to quantify. We have based our computation of mitigating circumstances on a database compiled by the dissent.

surprisingly, those sentenced to death presented fewer still: as the concurrence in dissent admits, black defendants sentenced to death averaged only 0.63[71] mitigating circumstances, whereas white defendants sentenced to death averaged 1.6.[72] *Id.* at 391 n.108. Although this information finds a place only in a footnote, it is exactly what "one would expect to find" if "the death penalty were color blind." *Id.* at 391.

¶153 The foregoing statistics suggest that mitigating circumstances, rather than "[a]ttitudes about race," explain the "unequal imposition of the death penalty when the jury is asked to decide death." *Id.* at 390, 392. They also suggest that jurors genuinely base their decisions on proof that mitigating evidence is insufficient to merit leniency. Except for 20-year-old Covell Thomas, none of the black defendants sentenced to death presented *any* "credible evidence of . . . mitigating circumstances as provided in RCW 10.95.070," and only a few offered some other "evidence of mitigating circumstances." RCW 10.95.120(3)(d), (c). The black defendants who received life sentences generally presented more mitigating evidence, and in some cases substantially more.

---

[69] Black defendants presented the following number of mitigating circumstances: TR 29 (0); TR 77 (5); TR 88 (2); TR 119 (1); TR 135 (3); TR 157 (1); TR 177 (0); TR 180 (0); TR 185 (2); TR 186 (1); TR 194 (1); TR 216 (0); TR 281 (0).

[70] White defendants presented the following number of mitigating circumstances: TR 2 (1); TR 3 (0); TR 7 (4); TR 9 (0); TR 15 (1); TR 16A (0); TR 20 (3); TR 23 (0); TR 25 (2); TR 26 (3); TR 31 (4); TR 34 (1); TR 36 (0); TR 39 (2); TR 42 (2); TR 43 (2); TR 44 (2); TR 45 (2); TR 47 (1); TR 48 (1); TR 50 (4); TR 51 (1); TR 52 (4); TR 53 (1); TR 56 (1); TR 58 (2); TR 60 (3); TR 62 (0); TR 63 (0); TR 64 (5); TR 65 (5); TR 66 (1); TR 73 (2); TR 75 (1); TR 76 (0); TR 86 (1); TR 92 (0); TR 93 (1); TR 95 (1); TR 125 (1); TR 132 (1); TR 140 (2); TR 144 (2); TR 154 (1); TR 164 (2); TR 165 (1); TR 167 (1); TR 174 (1); TR 175 (1); TR 176 (3); TR 181 (0); TR 182 (1); TR 183 (0); TR 184 (2); TR 190 (4); TR 220 (5); TR 227 (2); TR 251 (2); TR 258 (3); TR 303 (3).

[71] Black defendants sentenced to death presented the following number of mitigating circumstances: TR 29 (0); TR 119 (1); TR 135 (3); TR 177 (0); TR 180 (0); TR 194 (1); TR 216 (0); TR 281 (0).

[72] White defendants sentenced to death presented the following number of mitigating circumstances: TR 3 (0); TR 7 (4); TR 9 (0); TR 15 (1); TR 16A (0); TR 31 (4); TR 39 (2); TR 43 (2); TR 47 (1); TR 73 (2); TR 75 (1); TR 76 (0); TR 125 (1); TR 132 (1); TR 140 (2); TR 144 (2); TR 154 (1); TR 165 (1); TR 175 (1); TR 176 (3); TR 181 (0); TR 183 (0); TR 220 (5); TR 251 (2); TR 303 (3).

*See, e.g.,* TR 77; TR 88; TR 185. Again, that is exactly what one would expect to find.[73]

¶154 The concurrence in dissent states that the "relevant issue is how often juries return a verdict of death when the prosecution seeks the death penalty." Concurrence in dissent at 392.[74] Our examination reveals that juries have returned verdicts on the basis of the evidence presented[75] rather than the racial attitudes that the concurrence in dissent ascribes to them.[76] *See id.* at 390.

---

[73] The concurrence in dissent observes that "African-American defendants sentenced to death averaged fewer aggravating circumstances (2.0) than Caucasians (2.6)," referring to "Caucasian defendants sentenced to death." Concurrence in dissent at 391 & n.108. But if the point is to prove that the race of the defendant determines the sentence imposed, the relevant issue is not whether white defendants sentenced to *death* were "more deserving of the death sentence" than black defendants (we expect juries to return a verdict of death in more aggravated cases), but whether white defendants who received a *life* sentence were "more deserving of the death sentence" than black defendants. *Id.* at 391. In fact, white defendants who received a life sentence averaged fewer aggravating circumstances (1.9) than black defendants who received a life sentence (2.0). *Compare* TR 2 (1); TR 20 (1); TR 23 (1); TR 25 (1); TR 26 (2); TR 34 (2); TR 34A (1); TR 36 (1); TR 42 (1); TR 44 (2); TR 45 (4); TR 48 (1); TR 50 (1); TR 51 (1); TR 52 (2); TR 53 (3); TR 56 (3); TR 58 (2); TR 60 (1); TR 62 (2); TR 63 (3); TR 64 (4); TR 65 (4); TR 66 (2); TR 86 (1); TR 92 (2); TR 93 (1); TR 95 (1); TR 164 (3); TR 167 (2); TR 174 (2); TR 182 (2); TR 184 (1); TR 190 (1); TR 227 (5); and TR 258 (1), *with* TR 77 (1); TR 88 (1); TR 157 (2); TR 185 (5); and TR 186 (1).

[74] We are certain that if the State sought the death penalty more often when the defendant was black than when the defendant was white, instead of the other way around, the concurrence in dissent would find that fact "relevant."

[75] If we subtract mitigating factors from aggravating factors, we find that on average the aggravating factors attributable to white defendants sentenced to death outnumbered mitigating factors by 1.0, but in the case of white defendants who received a life sentence, by only 0.1. The contrast between black defendants sentenced to death and those who received a life sentence is even sharper: aggravating factors presented by black defendants sentenced to death outnumbered mitigating factors by 1.4, but the *mitigating* factors presented by black defendants who received a life sentence outnumbered aggravating factors by 0.2. Thus, where aggravating factors predominated, juries returned a verdict of death. Where they were counterbalanced by mitigating factors, juries returned a verdict of life without parole. Such "quantitative measurements," of course, "do not tell the entire story," but it is striking how well they accord with what "one would expect to find." Concurrence in dissent at 393, 391.

[76] A jury "deliberated for two days before reaching its decision to impose the death sentence" on Dwayne Woods, even though Woods "instructed his lawyers not to present any mitigating evidence at the penalty phase of the trial" and exercised his right of allocution to urge the jury to " 'vote to impose the death penalty.' "

Notably, the jurors who spared the lives of Charles Tate and Ray Lewis were all white. *See* TR 77, at 12; TR 88, at 11. More to the point, the jury that sentenced Cecil Davis to death (for the second time) was the picture of diversity, containing two black jurors, two Hispanic jurors, and one Asian juror. TR 281, at 12.

¶155 The concurrence in dissent admits that its statistical analysis "cannot tell us that petitioner Cecil Davis would not have received the death sentence if he had not been African-American." Concurrence in dissent at 393. We could not have said it better, our review of the reports of aggravated first degree murders revealing that white defendants and black defendants are sentenced to death in the same proportion: 14 percent. Considering that no two cases of aggravated first degree murder are exactly alike, we find that fact remarkable. We acknowledge that "we are not statisticians," *id.* at 401, but we see no evidence that racial discrimination pervades the imposition of capital punishment in Washington and, therefore, see no reason to remand this matter to the superior court for an evidentiary hearing that the petitioner did not seek.

¶156 Finally, we take the opportunity to respond to the suggestion that we have hitherto "ignore[d]" the "danger that the death penalty might not be imposed in a fair, equal, or just manner." *Id.* at 389, 393. The concurrence in dissent deplores the fact that in Davis's previous personal restraint petition we relied on *McCleskey v. Kemp*, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987), in rejecting Davis's "submission of . . . statistics that suggested that [the] death penalty is 'imposed more frequently when the defendant is nonwhite and the victim is white, and never, or almost

---

*Woods*, 143 Wn.2d at 621, 577, 578 (quoting Verbatim Report of Proceedings at 5774). As we said in *Woods*, "If the jury was motivated by racial prejudice, it seems probable, particularly in light of the absence of mitigating evidence, that it would have moved with more deliberate speed in imposing the death sentence." *Id.* at 621.

never, when the racial equation is reversed.' "[77] Concurrence in dissent at 399 (quoting *Davis*, 152 Wn.2d at 753). Our colleague states, "I fail to see how we can assure capital defendants or the legislature that race does not affect whether a capital defendant receives the death penalty in Washington when we brush aside the very statistical data that would assist us in making this determination." *Id.* at 401. We disagree that our opinion in *Davis* represents a refusal "to engage in some form of statistical analysis." *Id.* at 399. As our colleague himself recognizes, "the racial statistics in . . . *Davis* were put forth in the context of [a] constitutional challenge[ ] under the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution." *Id.* at 399. We consider it appropriate to rely on the United States Supreme Court's Eighth Amendment jurisprudence in reviewing an Eighth Amendment challenge. This court has not run from the issue of racial discrimination in capital sentencing. *See, e.g., Gentry*, 125 Wn.2d 570.

*Passion or prejudice*

¶157 Under our mandatory statutory review,

[w]e will vacate sentences that were the product of appeals to the passion or prejudice of the jury, such as "arguments intended to 'incite feelings of fear, anger, and a desire for revenge' and arguments that are 'irrelevant, irrational, and inflammatory . . . that prevent calm and dispassionate appraisal of the evidence.' "

---

[77] Since the concurrence in dissent incorporates the argument by reference, we note that the death penalty was imposed in 6 of the 51 cases (12 percent) in which " 'the defendant [was] nonwhite and the victim [was] white,' " and 2 of the 14 cases (14 percent) in which " 'the racial equation [was] reversed.' " Concurrence in dissent at 399 (quoting *Davis*, 152 Wn.2d at 753). *Compare* TR 1; TR 11; TR 19; TR 33; TR 38; TR 60; TR 70; TR 77; TR 79; TR 80; TR 82; TR 83; TR 85, 85A; TR 88; TR 102; TR 103; TR 109; TR 113; TR 119; TR 120; TR 126; TR 130; TR 135; TR 141; TR 158; TR 160; TR 161; TR 172; TR 177; TR 185; TR 186; TR 188; TR 193; TR 194; TR 204; TR 206; TR 212; TR 216; TR 224; TR 230; TR 248; TR 249; TR 252; TR 256; TR 271; TR 280; TR 289; TR 290; TR 301; TR 306; *and* TR 307, *with* TR 20; TR 27; TR 76; TR 99; TR 118; TR 162; TR 168; TR 174; TR 176; TR 217; TR 218; TR 219; TR 242; *and* TR 243.

*Cross*, 156 Wn.2d at 634-35 (alteration in original) (quoting *Elledge*, 144 Wn.2d at 85 (quoting BENNETT L. GERSHMAN, TRIAL ERROR AND MISCONDUCT § 2-6(b)(2), at 171-72 (1997))). Here, Davis's only argument that the jury's decision was based on passion and prejudice merely repeats the jury instruction and prosecutor misconduct issues discussed above. We have already addressed and rejected these claims. There is no other evidence that the jury's verdict was based on an improper argument or improper motives. The jury was instructed not to be influenced by passion or prejudice, and we presume that jurors follow the court's instructions. *Lord*, 117 Wn.2d at 861. RCW 10.95.130(2)(c) provides no basis for reversing Davis's sentence.

*Mental retardation*

¶158 To have an intellectual disability considered by RCW 10.95.130(2)(d), the defendant's IQ must be 70 or below. RCW 10.95.030(2)(a), (c). At trial, no mental health expert testified that Davis's IQ was 70 or below. On appeal, Davis does not claim he is intellectually disabled or that he was intellectually disabled at the time of the crime.[78] RCW 10.95.130(2)(d) therefore does not require reversal.

## IV. CONCLUSION

¶159 We conclude Davis has failed to establish reversible error and that reversal is not required under RCW 10.95-.130. We therefore affirm his sentence of death.

MADSEN, C.J., and C. JOHNSON, OWENS, and J.M. JOHNSON, JJ., concur.

CHAMBERS, J., concurs in the result only.

---

[78] At trial, Davis moved to dismiss based on a challenge to Washington's statutory scheme regarding mentally retarded defendants convicted of aggravated murder. The court denied the motion. The court also entered findings of fact that the defendant was not mentally retarded at the present time or at the time of the crime. On appeal, Davis does not challenge the denial of the motion to dismiss or the court's findings and conclusions on mental retardation.

¶160 FAIRHURST, J. (dissenting) — Washington statutes require us to reverse any death sentence that is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b), .140(1)(b). While the majority purports to undertake the required analysis, it overlooks dozens of life sentences imposed for aggravated murders similarly brutal to the one Cecil Emile Davis committed. Our proportionality review will not tolerate the randomness that these sentences reveal in Washington's system of imposing the ultimate punishment. Davis's death sentence should be remanded for imposition of a sentence of life imprisonment without possibility of parole. I dissent.

¶161 This court is required to evaluate every death sentence to determine whether it is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). " '[S]imilar cases' " is a term defined by statute as

> cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120.

*Id.* Under RCW 10.95.120, trial judges must submit reports in all cases where the defendant is convicted of aggravated first degree murder, including where the defendant pleads guilty. Therefore, the plain language of our proportionality statute requires us to consider all aggravated first degree murder convictions, regardless of whether the prosecutor pursued the death penalty or whether the fact finder returned a sentence of death or life imprisonment. If we determine the defendant's sentence is excessive or disproportionate to the cases in this group, we must reverse the death sentence for the imposition of a life imprisonment sentence. RCW 10.95.140(1)(b).

¶162 We must avoid the temptation to confuse the question actually posed by RCW 10.95.130(2)(b) with the question of whether Davis's death sentence is proportionate to his crime. The statute does not ask us to evaluate Davis and his crime in a vacuum. Such an interpretation not only ignores the statute's plain language, it reduces proportionality to a tautology: aggravated murders are by definition the worst possible crimes, so they will always be proportionate to the worst possible punishment. Instead, the statute asks us to compare the defendant's sentence to the sentence imposed in all other aggravated murder cases, including life sentences and the results of plea bargains.

¶163 Having identified the correct pool of comparable cases—all aggravated murder convictions, regardless of whether the death penalty was pursued or imposed—we still must determine what it means for a sentence to be disproportionate. While we have approached this inquiry in a variety of ways, we have consistently stressed that

> "[t]his court is not required to determine that less than a death sentence was never imposed in a case with some similar characteristics. On the contrary, we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed *generally* and not wantonly and freakishly imposed."

*State v. Harris*, 106 Wn.2d 784, 798, 725 P.2d 975 (1986) (alteration in original) (internal quotation marks omitted) (quoting *Moore v. State*, 233 Ga. 861, 864, 213 S.E.2d 829 (1975)); *see also, e.g., State v. Brown*, 132 Wn.2d 529, 555, 940 P.2d 546 (1997) (referencing the same standard); *State v. Benn*, 120 Wn.2d 631, 679, 845 P.2d 289 (1993) (same).

¶164 In my view, when we follow the statutory mandate to consider similar cases, it becomes apparent that the death penalty is not imposed generally in similar cases in Washington State. Considering the crime and the defendant, it is impossible to predict whether a defendant convicted of a brutal aggravated murder will be sentenced to

life in prison or death. The majority fails to reach this conclusion because despite the statute's plainly worded mandate, it does not meaningfully analyze cases where the death penalty was not sought or imposed. The only life sentence that the majority explicitly discusses is that of Gary Ridgway, who strangled 48 women and often returned to rape their corpses. Majority at 350-51. The majority characterizes Ridgway's sentence as an anomaly that could not alone render the death penalty disproportionate. *Id.* at 350. When we use the correct statutory pool, the same four factors analyzed by the majority illustrate that Ridgway's life sentence can no longer be characterized as unique.[79] Rather, Ridgway is a notable entry in a long list of murderers who escaped death for crimes comparable to those that support death sentences.

¶165 The majority first considers the nature of the crime, which involved substantial conscious suffering due to the violent rape. Majority at 349. Since our death penalty statute was enacted in 1981, at least 45 murderers have been sentenced to life in prison for aggravated murders involving rape, sexual assault, or sexual mutilation. Report of Trial Judge[80] (TR) 1 (Mario Ortiz raped 77-year-old victim, stabbed her, shattered her face by a massive blow, and dragged her down the stairs by the head); TR 2 (Arnold Brown digitally raped and strangled to death his 7-year-old niece); TR 6 (Kenneth Hovland raped and sodomized 16-year-old victim with a blunt object, stabbed her eight times, and suffocated her by forcing her face into the mud); TR 8 (Charles Bingham raped and strangled intellectually disabled victim); TR 18 (Brian Kester raped victim at gun-

[79] The majority states that my consideration of these factors "postpones . . . consideration of mitigating factors" and offers critical evidence "belatedly." Majority at 356. But I address the four factors in the same order as the majority. It should not be overly burdensome for the majority to read my analysis in the same order in which it presents its own or, indeed, to confront the substance of my argument without suggesting deceit in the manner in which I present it.

[80] Reports of the trial judge filed pursuant to RCW 10.95.120 are on file with the Washington State Supreme Court Clerk's Office.

378

point, then fatally shot her in the face and breast); TR 27, at 8 (John Anderson raped victim, perforating her vagina, broke all her facial bones, knocked out her teeth, "pulpified" her eye, punctured her neck, and strangled her); TR 36 (Bradley Bushey beat, raped, and strangled victim); TR 45 (James Dykgraaf tied up victim, sexually assaulted her for an hour, strangled her for several minutes, then shot her with a sawed-off shotgun); TR 49 (Michael Idhe anally, orally, and vaginally raped 67-year-old victim, then strangled her); TR 50 (Sean Stevenson shot his sister, raped her, and then fatally shot her; Stevenson also fatally shot his parents); TR 55 (Russell Stenger kidnapped a woman jogging, raped her repeatedly at gunpoint, drove her to another location and raped her again, tied her to a tree, and shot her); TR 56 (Daniel Yates bound, raped, then shot victim); TR 58 (Gene Kane sexually assaulted victim, then stabbed her to death); TR 67 (Susan Cummings raped and killed victim); TR 79 (Sherwood Knight broke into victim's apartment, raped her, and strangled her); TR 81 (Martin Sanders raped two 14-year-old girls, beat one in the head with a tire jack, then strangled them); TR 83 (Ronald Thomas hog-tied victim to bed, raped, and strangled her); TR 94 (Daniel Edwards raped and shot victim); TR 100 (Michael Hightower raped and shot victim); TR 102, 103 (Emmett Nash and Jose Nash kidnapped, raped, and strangled victim); TR 109 (Gregory Scott raped, suffocated, and strangled victim); TR 120 and *State v. Russell*, 125 Wn.2d 24, 30-36, 882 P.2d 747 (1994) (George Russell raped and sexually assaulted three women; strangled, bludgeoned, or stabbed them to death; and left their bodies posed in gruesome, sexual positions); TR 124 (Christopher Bradley raped victim and stabbed her to death with pocket knife); TR 136 (Michael Green kidnapped, stabbed, and bludgeoned to death 12-year-old victim; victim was also raped); TR 137 (Charles Bolton raped 75-year-old woman, possibly using scissors, then threw her into river to drown or freeze); TR 142 (Keith Dyer raped and stabbed 13-year-old to death); TR 150 (Michael Lauderdale bound victim, anally

raped him, and bludgeoned him with a baseball bat); TR 166 (William Robinson Jr. held victim hostage for hours, anally raping, stabbing, and ultimately suffocating her); TR 167 (Jack Spillman III repeatedly, fatally stabbed one woman and bludgeoned another, then sexually mutilated and eviscerated them); TR 172 (James Thomas strangled mother and 13-year-old daughter after raping the daughter); TR 184 (Guy Rasmussen kidnapped 9-year-old; body found beaten and raped, with cigarette burns on thighs and panties stuffed in throat); TR 185 (Robert Parker gagged two women with their undergarments, raped them, stabbed them in the abdomen, and strangled them); TR 186 (Gerald Davis tied up 77-year-old woman, raped her, smashed her eye socket, slashed her with a knife, then strangled her; also suffocated 91-year-old woman with a gag after hitting her over the head); TR 191 (Dennis Smith raped and killed victim); TR 193 (David Lewis digitally raped and fatally stabbed 12-year-old victim); TR 207 (Donnie Ivy stabbed and strangled 63-year-old victim; victim's body found with vaginal hemorrhaging); TR 215 (Ulus Rogers raped the victim, possibly postmortem, and fatally stabbed her); TR 227 (Brodie Waldradt bound and gagged his ex-fiancée, who was pregnant with full-term child, raped her, and bludgeoned her to death); TR 236 (Duwayne Bender raped and stabbed 65-year-old victim); TR 239 (Lloyd Monroe beat, raped, and strangled victim); TR 245 (James Kinney raped and bludgeoned victim); TR 252 (Roy Webbe raped the victim, stabbed her, and severed her spinal cord, possibly in an attempted decapitation); TR 260 (Scott Fischer raped, beat, and strangled victim); TR 265 (Gary Ridgway strangled 48 women, often returning to rape their corpses).[81]

---

[81] Because RCW 10.95.130(2)(b) defines "'similar cases'" as including cases where trial reports were filed pursuant to RCW 10.95.120, the facts of the aggravated murder convictions listed in this opinion are based primarily on the information contained in those reports. Consistent with the court's conclusion in *State v. Cross*, 156 Wn.2d 580, 636-37, 132 P.3d 80 (2006), I include even those sentences that were later vacated. Throughout the opinion, there are two

¶166 In contrast, since our death penalty statute was enacted, only 13 death sentences other than Davis's have been imposed for murders involving rape or sexual assault.[82] Thus, defendants sentenced to life in prison for murders involving rape or sexual assault far outnumber those who receive the death penalty for such crimes. In fact, defendants sentenced to life in prison for murders involving rape or sexual assault even outnumber the 31 defendants who have received death sentences since our current statute was enacted.[83]

---

categories of defendants who I do not include as receiving life sentences despite trial reports indicating the contrary. First, where a defendant received a life sentence after an original death sentence was vacated, I include the defendant only for purposes of the original death sentence. For example, while Richard Clark's second trial report (TR 277) might seem to fit in the foregoing list of aggravated murders involving sexual assault, it is not listed because he received a life sentence only after his original death sentence was vacated. Second, in 1993, this court held that Washington State does not authorize the death penalty for crimes committed by juveniles. *State v. Furman*, 122 Wn.2d 440, 456, 858 P.2d 1092 (1993). I therefore exclude from the lists of defendants receiving life sentences those defendants who, at the time they were sentenced, were ineligible for the death penalty under *Furman*. I do include juveniles who were eligible for the death penalty at the time they were sentenced because *Furman* had not yet been decided. *E.g.*, TR 50 (Sean Stevenson).

I believe the foregoing practices of including and excluding certain trial reports are favorable to the majority, as they generally minimize the number of life sentences listed and generously include other death penalty cases as comparable to Davis's case. In using this methodology, I hope to demonstrate that the random imposition of death sentences in Washington is not merely a manipulation of the relevant numbers but a reality that emerges even when viewing our cases in the manner most apt to demonstrate that Davis's sentence is proportional.

[82] TR 9 (Charles Campbell); TR 39 (Clark Hazen); TR 47 (Brian Lord); TR 73 (Michael Furman); TR 76 (Westley Dodd); TR 119 (Jonathan Gentry); TR 140 (Cal Brown); TR 160 (Jeremy Sagastegui); TR 165 (Clark Elmore); TR 175 (Richard Clark); TR 177 (Dwayne Woods); TR 216 (Allen Gregory); TR 251 (Robert Yates Jr.).

[83] TR 3 (Dwayne Bartholomew); TR 7, 31 (Mitchell Rupe); TR 9 (Charles Campbell); TR 13 (Kwan Mak); TR 15 (Patrick Jeffries); TR 29 (Benjamin Harris); TR 39 (Clark Hazen); TR 43 (David Rice); TR 47 (Brian Lord); TR 73 (Michael Furman); TR 75 (Gary Benn); TR 76 (Westley Dodd); TR 119 (Jonathan Gentry); TR 125 (James Brett); TR 132 (Blake Pirtle); TR 135 (Sammie Luvene); TR 140 (Cal Brown); TR 144 (Darold Stenson); TR 154 (Charles Finch); TR 160 (Jeremy Sagastegui); TR 165 (Clark Elmore); TR 175 (Richard Clark); TR 176 (Michael Roberts); TR 177 (Dwayne Woods); TR 181 (Henry Marshall III); TR 183 (James Elledge); TR 194 (Covell Thomas); TR 216 (Allen Gregory); TR 220 (Dayva Cross); TR 251 (Robert Yates Jr.); TR 303 (Conner Schierman).

¶167 The majority next considers both the number and nature of the aggravating factors in Davis's case: robbery, burglary, and rape. Majority at 351-52. With regard to nature, the violent rape stands out as the distinguishingly heinous feature of Davis's crime. Rape is not always charged or found applicable in aggravating murder cases involving sex crimes, so the pool of defendants for whom rape was found to be an aggravator is smaller than the group of 45 defendants, listed above, whose crimes involved sexual assault. The ratio of life sentences to death sentences for murders with an aggravating factor of rape, however, is similar. Rape was found to be an aggravating factor in 34 cases resulting in life sentences,[84] but it was an aggravating factor in only 7 death penalty cases.[85] Accordingly, rape-murderers with life sentences outnumber those with death sentences more than four-to-one.

¶168 With regard to number of aggravators, 38 defendants with three or more aggravating factors were sentenced to life in prison,[86] whereas 15 defendants with three

---

[84] TR 1 (Mario Ortiz); TR 2 (Arnold Brown); TR 6 (Kenneth Hovland); TR 8 (Charles Bingham); TR 18 (Brian Kester); TR 27 (John Anderson); TR 36 (Bradley Bushey); TR 45 (James Dykgraaf); TR 49 (Michael Idhe); TR 50 (Sean Stevenson); TR 55 (Russell Stenger); TR 56 (Daniel Yates); TR 67 (Susan Cummings); TR 79 (Sherwood Knight); TR 81 (Martin Sanders); TR 83 (Ronald Thomas); TR 94 (Daniel Edwards); TR 100 (Michael Hightower); TR 102 (Emmett Nash); TR 103 (Jose Nash); TR 109 (Gregory Scott); TR 124 (Christopher Bradley); TR 142 (Keith Dyer); TR 150 (Michael Lauderdale); TR 166 (William Robinson Jr.); TR 185 (Robert Parker); TR 191 (Dennis Smith); TR 215 (Ulus Rogers); TR 227 (Brodie Waldradt); TR 236 (Duwayne Bender); TR 239 (Lloyd Monroe); TR 245 (James Kinney); TR 252 (Roy Webbe); TR 260 (Scott Fischer).

[85] Rape was found to be an aggravating circumstance in the following cases: TR 39 (Clark Hazen); TR 47 (Brian Lord); TR 73 (Michael Furman); TR 140 (Cal Brown); TR 165 (Clark Elmore); TR 175 (Richard Clark); and TR 216 (Allen Gregory). Rape was not found to be an aggravating circumstance in the case of TR 76 (Westley Dodd); TR 119 (Jonathan Gentry); TR 160 (Jeremy Sagastegui); TR 177 (Dwayne Woods); or TR 251 (Robert Yates Jr.).

[86] TR 18 (Brian Kester); TR 35 (John Lennon); TR 45 (James Dykgraaf); TR 53 (James Thompson); TR 55 (Russell Stenger); TR 56 (Daniel Yates); TR 61 (Russell McNeil); TR 63 (Leslie McVay); TR 64 (Jonathan Woods); TR 65 (Jeffrey Lane); TR 67 (Susan Cummings); TR 70 (Herbert Rice); TR 81 (Martin Sanders); TR 82 (Melvin Stohs); TR 97 (James Fountain); TR 107 (David Simmons); TR 108 (Henry Dailey); TR 113 (Julian Loera); TR 115 (Daniel Tash); TR 128 (Tommy Metcalf);

or more aggravators, excluding Davis, were sentenced to death.[87] Accordingly, defendants whose crimes are comparable to or worse than Davis's crime based on the number of aggravating factors have been sentenced to life in prison more than twice as often as they have been sentenced to death.

¶169 The third factor the majority considers is Davis's prior convictions. As the majority points out, Davis had a lengthy criminal history. Majority at 352-53. Accordingly, we might appropriately exclude from the pool of comparable cases those defendants with no criminal history. Of the 45 defendants listed above who received life sentences for sex-related murders, 32 had some criminal history.[88] This is still substantially greater than the 13 death sentences imposed for murders involving rape or sexual assault.[89] Moreover, the criminal histories of the 32 remaining defen-

TR 141 (Bryan Powers); TR 164 (Steven Morgan); TR 185 (Robert Parker); TR 191 (Dennis Smith); TR 206 (Vy Thang); TR 209 (Terence Weaver); TR 215 (Ulus Rogers); TR 224 (Nicolas Vasquez); TR 227 (Brodie Waldradt); TR 231 (James Ferrell); TR 232 (Kenneth Leuluaialii); TR 236 (Duwayne Bender); TR 239 (Lloyd Monroe); TR 245 (James Kinney); TR 267 (Alex Baranyi); TR 280 (Ulysses Handy III); TR 296 (Darrell Jackson); TR 297 (Tyreek Smith).

[87] TR 7, 31 (Mitchell Rupe); TR 9 (Charles Campbell); TR 39 (Clark Hazen); TR 43 (David Rice); TR 47 (Brian Lord); TR 73 (Michael Furman); TR 76 (Westley Dodd); TR 125 (James Brett); TR 132 (Blake Pirtle); TR 140 (Cal Brown); TR 154 (Charles Finch); TR 175 (Richard Clark); TR 176 (Michael Roberts); TR 194 (Covell Thomas); TR 251 (Robert Yates Jr.).

[88] TR 2 (Arnold Brown); TR 6 (Kenneth Hovland); TR 27 (John Anderson); TR 36 (Bradley Bushey); TR 45 (James Dykgraaf); TR 49 (Michael Idhe); TR 55 (Russell Stenger); TR 56 (Daniel Yates); TR 58 (Gene Kane); TR 79 (Sherwood Knight); TR 81 (Martin Sanders); TR 83 (Ronald Thomas); TR 94 (Daniel Edwards); TR 100 (Michael Hightower); TR 102 (Emmett Nash); TR 103 (Jose Nash); TR 120 (George Russell); TR 136 (Michael Green); TR 137 (Charles Bolton); TR 142 (Keith Dyer); TR 167 (Jack Spillman III); TR 184 (Guy Rasmussen); TR 185 (Robert Parker); TR 186 (Gerald Davis); TR 191 (Dennis Smith); TR 193 (David Lewis); TR 215 (Ulus Rogers); TR 227 (Brodie Waldradt); TR 239 (Lloyd Monroe); TR 252 (Roy Webbe); TR 260 (Scott Fischer); TR 265 (Gary Ridgway). The trial reports indicated that 10 defendants had no criminal history. TR 1 (Mario Ortiz); TR 18 (Brian Kester); TR 50 (Sean Stevenson); TR 67 (Susan Cummings); TR 109 (Gregory Scott); TR 150 (Michael Lauderdale); TR 172 (James Thomas); TR 207 (Donnie Ivy); TR 236 (Duwayne Bender); TR 245 (James Kinney). The reports are unclear on whether three defendants had prior convictions. TR 8 (Charles Bingham); TR 124 (Christopher Bradley); TR 166 (William Robinson Jr.).

[89] *Supra* note 82.

dants are significant. For example, 8 were previously convicted of rape.[90]

¶170 The majority states that Davis is in a special category because few other aggravated murder defendants had prior murder or manslaughter convictions. Majority at 352. But nearly one-half of all defendants with prior murder or manslaughter convictions were sentenced to life in prison.[91] Furthermore, it seems to me that the significance of a prior murder or manslaughter conviction rests largely on the fact that the defendant has taken more than one life. Accordingly, we should also consider defendants who committed the aggravated murder of two or more victims. Of 92 death-eligible defendants who committed aggravated murder involving two or more victims, 75 received life sentences[92] and only 17 were sentenced to death.[93]

---

[90] TR 36 (Bradley Bushey); TR 49 (Michael Idhe); TR 81 (Martin Sanders); TR 100 (Michael Hightower); TR 102 (Emmett Nash); TR 136 (Michael Green); TR 184 (Guy Rasmussen); TR 252 (Roy Webbe).

[91] Twelve defendants had prior murder or manslaughter convictions. Five, all with prior murder convictions, were sentenced to life imprisonment. TR 23 (Robert Hughes); TR 38 (Charles Harris); TR 44 (Dennis Williams); TR 48 (Christopher St. Pierre); TR 191 (Dennis Smith). Seven were sentenced to death. TR 29 (Benjamin Harris); TR 47 (Brian Lord); TR 119 (Jonathan Gentry); TR 154 (Charles Finch); TR 176 (Michael Roberts); TR 183 (James Elledge); TR 251 (Robert Yates Jr.).

[92] TR 4 (Jimmy Ramil); TR 5 (Pompeyo Guloy); TR 10 (Steven Carey); TR 12 (Gregory Brown); TR 14 (Benjamin Ng); TR 16 (William Kincaid); TR 20 (William Martin); TR 22 (Fortunato Dictado); TR 37 (Robert Strandy); TR 42 (Kenneth Petersen); TR 50 (Sean Stevenson); TR 53 (James Thompson); TR 59 (Thomas Baja); TR 61 (Russell McNeil); TR 68 (Darrin Hutchinson); TR 69 (Lawrence Sullens); TR 70 (Herbert Rice); TR 81 (Martin Sanders); TR 84 (Shawn Dee Reite); TR 86 (Rick Peerson); TR 95 (Kenneth Schrader); TR 96 (Gregory Fish); TR 97 (James Fountain); TR 99 (Stanley Runion); TR 101 (Miniviluz Macas); TR 107 (David Simmons); TR 108 (Henry Dailey Jr.); TR 128 (Tommy Metcalf); TR 130 (Cherno Camara); TR 146 (Martin Bulichi); TR 148 (Troy Oakes); TR 152 (Steven McCord); TR 157 (Vincent Sherrill); TR 161 (Nga Ngoeung); TR 162 (Anthony Sammons); TR 167 (Jack Spillman, III); TR 168 (Scott Pierce); TR 172 (James Thomas); TR 174 (Timothy Blackwell); TR 182 (Joey Ellis); TR 185 (Robert Parker); TR 186 (Gerald Davis); TR 187 (Derrick Jones); TR 190 (Sean Jones); TR 198 (Joseph Schuler II); TR 199 (Eric Krueger); TR 203 (Marvin Francisco); TR 210 (Cheyenne Brown); TR 211 (Dennis Anfinson); TR 213 (Richard Morgan); TR 218 (Billy Neal Jr.); TR 219 (Billy Neal Sr.); TR 232 (Kenneth Leuluaialii); TR 234 (Kenneth Ford); TR 238 (Michael Thornton); TR 240 (Kimonti Carter); TR 247 (Jimmee Chea); TR 256 (Kevin Cruz); TR 264 (Robert Anderson); TR 265 (Gary Ridgway); TR 272 (Herbert Riggins); TR 273 (Nellish Phadnis); TR 275 (Richard

¶171 The final factor, Davis's personal history, revealed a difficult childhood, low intelligence, and personality disorders. It is virtually impossible to compare mitigating factors among all "similar cases," as that term is defined by statute, because a defendant does not present mitigating factors unless a special sentencing proceeding[94] occurs. Therefore, cases where the death penalty was not sought are effectively excluded from our comparison of this factor. The phrasing of the report of the trial judge form adds further difficulty because it allows the trial judge's opinion to affect the number of mitigating circumstances included in the report. The form asks, "Was there, *in the court's opinion, credible evidence* of any mitigating circumstances as provided in Laws of 1981, ch. 138, § 7?" (Emphasis added.) Davis's second trial report illustrates the problem this phrasing can cause. The judge indicated that no mitigating evidence whatsoever was presented. TR 281, at 7-8. In fact, four experts testified to Davis's low intelligence and personality disorders, and the jury was instructed on two statutory mitigating factors. Clerk's Papers at 1165 (Instruction 6); Report of Proceedings (May 15, 2007) at 3490.[95] Therefore, Davis's trial report seems to reflect the

---

Prather); TR 276 (Mitchell Amell); TR 278 (Melvin Johnson); TR 279 (Brandon Martin); TR 280 (Ulysses Handy III); TR 282 (John Morimoto); TR 287 (Brian Matsen); TR 291 (Bryan Kim); TR 296 (Darrell Jackson); TR 297 (Tyreek Smith); TR 299 (Saroeun Phai); TR 300 (Areewa Saray); TR 302 (Charles Nettlebeck).

[93] TR 7 (Mitchell Rupe); TR 9 (Charles Campbell); TR 13 (Kwan Mak); TR 15 (Patrick Jeffries); TR 39 (Clark Hazen); TR 43 (David Rice); TR 75 (Gary Benn); TR 76 (Westley Dodd); TR 132 (Blake Pirtle); TR 144 (Darold Stenson); TR 154 (Charles Finch); TR 160 (Jeremy Sagastegui); TR 177 (Dwayne Woods); TR 220 (Dayva Cross); TR 251 (Robert Yates, Jr.); TR 132 (Blake Pirtle); TR 303 (Conner Schierman).

[94] A special sentencing proceeding is the statutory name for a proceeding in which the death penalty is sought. RCW 10.95.050. If the prosecutor does not pursue death, no special sentencing proceeding occurs.

[95] The jury was instructed to consider the statutory mitigating factors of "[w]hether the murder was committed while the defendant was under the influence of extreme mental disturbance" and "[w]hether, at the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental defect or disease."

trial judge's assessment of the credibility of the mitigating evidence rather than what the jury actually heard.

¶172 If we do compare mitigating circumstances, notwithstanding the methodological problems mentioned, the trial reports reveal that while 36 defendants who presented evidence of two or fewer mitigating factors were sentenced to life in prison,[96] 26 such defendants, other than Davis, were sentenced to death.[97] Of those sentenced to death, three requested or did not oppose the death penalty.[98] Therefore, to the limited extent we can meaningfully compare mitigating factors, we can again conclude that even where aggravated murder defendants present little mitigating evidence, they are more likely to be sentenced to life than to death.

¶173 To summarize, over three times as many defendants received life sentences for aggravated murders involving sexual assault as were sentenced to death. The disparity in favor of life sentences increases to more than four-to-one when we consider cases where rape was found to be an aggravating factor. If we eliminate defendants with no criminal history, persons convicted of aggravated murder

[96] TR 2 (Arnold Brown); TR 23 (Robert Hughes); TR 25 (James Daugherty); TR 34 (Paul St. Pierre); TR 36 (Bradley Bushey); TR 42 (Kenneth Petersen); TR 44 (Dennis Williams); TR 45 (James Dykgraaf); TR 48 (Christopher St. Pierre); TR 51 (David Jirovec); TR 53 (James Thompson); TR 56 (Daniel Yates); TR 58 (Gene Kane); TR 62 (Thomas Kron); TR 63 (Leslie McVay); TR 66 (James Elgren); TR 70 (Herbert Rice); TR 86 (Rick Peerson); TR 88 (Ray Lewis); TR 92 (Marc Darrah); TR 93 (Timothy Caffrey); TR 95 (Kenneth Schrader); TR 100 (Michael Hightower); TR 157 (Vincent Sherrill); TR 158 (Roderick Selwyn); TR 164 (Steven Morgan); TR 167 (Jack Spillman III); TR 174 (Timothy Blackwell); TR 182 (Joey Ellis); TR 184 (Guy Rasmussen); TR 185 (Robert Parker); TR 186 (Gerald Davis); TR 197 (Joseph Revay); TR 224 (Nicolas Vasquez); TR 227 (Brodie Waldradt); TR 256 (Kevin Cruz).

[97] TR 3 (Dwayne Bartholomew); TR 9 (Charles Campbell); TR 13 (Kwan Mak); TR 15 (Patrick Jeffries); TR 29 (Benjamin Harris); TR 39 (Clark Hazen); TR 43 (David Rice); TR 47 (Brian Lord); TR 73 (Michael Furman) TR 75 (Gary Benn); TR 76 (Westley Dodd); TR 119 (Jonathan Gentry); TR 125 (James Brett); TR 132 (Blake Pirtle); TR 140 (Cal Brown); TR 144 (Darold Stenson); TR 154 (Charles Finch); TR 160 (Jeremy Sagastegui); TR 165 (Clark Elmore); TR 175 (Richard Clark); TR 177 (Dwayne Woods); TR 181 (Henry Marshall III); TR 183 (James Elledge); TR 194 (Covell Thomas); TR 216 (Allen Gregory); TR 251 (Robert Yates Jr.).

[98] TR 76 (Westley Dodd); TR 160 (Jeremy Sagastegui); TR 177 (Dwayne Woods).

involving sexual assault were still almost two and one-half times more likely to be sentenced to life in prison than sentenced to death.

¶174 Certainly, our proportionality review is not merely a statistical task. *See* majority at 350. Anecdotally, we could also conclude that aggravated murderers whose crimes and histories are comparable to Davis's have received life sentences. For example, Gerald Davis tied up, raped, beat, and stabbed a 77-year-old woman and tied up, bludgeoned, and suffocated a 91-year-old. TR 186. He committed this crime just four days after Cecil Davis raped and murdered Yoshiko Couch. *Id.* Gerald Davis was 36 years old, a year younger than Cecil Davis, at the time of Couch's murder. *Id.* Like Cecil Davis, Gerald Davis had a low intelligence quotient of 77, and at trial, he presented mitigating evidence of an abusive, troubled childhood. *Id.* He was sentenced to life in prison. *Id.* Certainly, small differences can be found between Cecil Davis's and Gerald Davis's cases. But without invading the jury's role, it is hard to fathom why Cecil Davis was sentenced to death while Gerald Davis was sentenced to life imprisonment.

¶175 Or take Martin Sanders, who raped and strangled two 14-year-old girls, one of whom he also severely beat with a tire jack. TR 81. He was age 30 or 31 when he committed the crime and had a criminal history of kidnapping, assault, and sexual intercourse without consent. *Id.* There was evidence that Sanders had poor scholastic performance and a difficult upbringing, but he was found competent to stand trial. *Id.* On a plea bargain, he was sentenced to life in prison. *Id.*

¶176 Faced with these statistical and anecdotal comparisons, I cannot vote to affirm Davis's death sentence with assurance that the death penalty has been imposed generally in other similar cases throughout the state. *See Harris*, 106 Wn.2d at 798. Rather, Davis's case illustrates the randomness that plagues our system. While perfect consistency in deciding who is sentenced to death may not be

attainable, our statutes do not permit the crime and the defendant to become meaningless as predictors of the sentence imposed. Yet this has, in fact, occurred: the nature of Davis's crime, his prior convictions, the aggravating factors found applicable, and his personal history do not reveal why he was sentenced to die.

¶177 The majority suggests that our death penalty system is proportional because death and life sentences can be explained by factors beyond the crime and the defendant, such as the strength of the State's case; the wishes of the victim's family; or facts known to the defendant about other, unsolved cases. In concluding that these factors make the death penalty proportional, the majority again ignores the language of RCW 10.95.130(2)(b), mistaking the question of whether a sentence is appropriate in an individual case for whether the sentence is generally imposed in similar cases. But the statute requires us to analyze the death penalty, a punishment unique in its severity and irrevocability, on a system-wide level.

¶178 When one takes the broad, statutorily directed perspective, factors that appear rational at an individual level become irrational. For example, the majority states that Martin Sanders's life sentence is due, in part, to the recommendation of one of the victim's parents and the fact that Sanders agreed to talk with authorities about an unsolved murder. Majority at 357-58 (citing TR 81). These are rational considerations when viewing Sanders's case alone. But when viewed as part of a system of deciding who dies and who lives, the same factors create irrational, perverse results. A murderer is more likely to escape death if he has concealed the details of an unsolved crime or fortuitously picked a victim whose family opposes the death penalty.

¶179 Other, impermissible factors may play an even greater role in whether the death penalty is imposed. While it is not yet clear that a causal relationship exists, I am troubled that since this court upheld Davis's first death

sentence as proportional in 2000, the only counties where death sentences have been imposed are King and Pierce.[99] This fact raises the possibility that the county in which a crime is committed, rather than the crime or the defendant, may determine who receives the death penalty. While neither our trial reports nor the record in Davis's case confirms that the death penalty's imposition is based on geographical fortuity, we should carefully watch this trend in future cases.

¶180 It is not an answer to pretend that the unique factors of each case tie our hands, making us impotent to perform our statutory duty because no truly "similar" cases exist. Certainly, crimes " ' "cannot be matched up like so many points on a graph." ' " Majority at 354 (quoting *Benn*, 120 Wn.2d at 680 (quoting *Lord*, 117 Wn.2d at 910)). The fact that each aggravated murder case is not identical need not reduce our statutory inquiry to a meaningless exercise. We can, and must, evaluate the system as a whole.

¶181 When I look at the true statutory pool, I cannot escape the truth about Washington's death penalty. One could better predict whether the death penalty will be imposed on Washington's most brutal murderers by flipping a coin than by evaluating the crime and the defendant. Our system of imposing the death penalty defies rationality, and our proportionality review has become an "empty ritual." *Benn*, 120 Wn.2d at 709 (Utter, J., dissenting). I cannot agree that Davis's sentence is not excessive or disproportionate to the sentences imposed in similar cases. I therefore dissent.

STEPHENS, J., concurs with FAIRHURST, J.

¶182 WIGGINS, J. (concurring in dissent) — I concur with Justice Fairhurst's amply supported analysis of the random

---

[99] TR 194 (Covell Thomas, Pierce County); TR 216 (Allen Gregory, Pierce County); TR 220 (Dayva Cross, King County); TR 251 (Robert Yates Jr., Pierce County); TR 303 (Conner Schierman, King County).

and arbitrary nature of the imposition of the death penalty in Washington. I write separately to add my deep concern that the death penalty might be much more predictable than we have recognized. I refer, of course, to the race of the defendant. A review of the reports of prosecutions for aggravated first degree murder quickly discloses that African-American defendants are more likely to receive the death penalty than Caucasian defendants.[100] The only unresolved question in my mind is whether this pattern is sufficiently well established that the pattern is statistically significant.[101] Accordingly, I would either reverse the death penalty for the reasons so well stated in Justice Fairhurst's dissent or remand to superior court to take evidence on the statistical significance of the disproportionate number of African-Americans sentenced to death.

¶183 I begin with the observation that Cecil Emile Davis committed a horribly cruel, painful, and heinous crime when he murdered Yoshiko Couch. In the abstract, Davis may well deserve execution. But we cannot look at Davis alone. The legislature has wisely charged us with the task of examining "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). We cannot ignore whether the defendant's race becomes a significant factor in imposing the death penalty.

---

[100] The majority complains that neither party asked the court to review this issue. The legislature, not the parties, has directed us to review every death sentence to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). As discussed below, we have repeatedly said that this proportionality review is to ensure that the death penalty is not imposed arbitrarily or based on race. We would fail in this solemn responsibility if we shirked our duty.

[101] The majority incorrectly attributes to this dissent the belief that "the sentences that have been imposed in the last 30 years cannot be explained by aggravating and mitigating circumstances or other proper considerations, but can be explained by 'the race of the defendant.'" Majority at 362 (quoting concurrence in dissent at 389). As stated above, the disparity is apparent but the open question is whether the disparity is statistically significant in view of the sample size.

¶184 Before examining the reports, I emphasize that this opinion does not accuse anyone in the criminal justice system of racism, whether they are police, prosecutors, defense counsel, witnesses, jurors, or judges. The African-American experience in this country has been complex and frequently tragic. Attitudes about race can be so deeply buried in our individual and collective unconscious that it is difficult to evaluate their effect on our judgments or the judgments of others. The point is not that African-Americans have been deliberately treated differently with respect to the death penalty; the point is that they have in fact been treated differently.

¶185 Our analysis of the death penalty cases begins with the 73[102] aggravated first degree murder cases in which the prosecution sought the death penalty against African-Americans or Caucasians.[103] Thirteen of the 73 cases were against African-American defendants, including defendant Davis.[104] Of these 13, 8 received death sentences.[105] Thus, of the 13 cases in which the prosecution sought the death

---

[102] Under RCW 10.95.120, whenever a defendant is convicted of aggravated first degree murder, the trial judge must submit a report to the supreme court clerk containing information about the defendant, the victim, and other details about the case. All Reports of the Trial Judge (TR) are on file with the Washington State Supreme Court Clerk's Office. The cases analyzed in this opinion are TR 2, TR 3, TR 7, TR 9, TR 15, TR 20, TR 23, TR 25, TR 26, TR 29, TR 31, TR 34, TR 34A, TR 36, TR 39, TR 42, TR 43, TR 44, TR 45, TR 47, TR 48, TR 50, TR 51, TR 52, TR 53, TR 56, TR 58, TR 60, TR 62, TR 63, TR 64, TR 65, TR 66, TR 73, TR 75, TR 76, TR 77, TR 86, TR 88, TR 92, TR 93, TR 95, TR 119, TR 125, TR 132, TR 135, TR 140, TR 144, TR 154, TR 157, TR 164, TR 165, TR 167, TR 174, TR 175, TR 176, TR 177, TR 180, TR 181, TR 182, TR 183, TR 184, TR 185, TR 186, TR 190, TR 194, TR 216, TR 220, TR 227, TR 251, TR 258, TR 281, and TR 303. Cecil Davis (TR 180, 281), Mitchell Rupe (TR 7, 31), and Paul St. Pierre (TR 34, 34A) faced multiple special sentencing proceedings and thus have multiple trial reports. We have included these additional trial reports in our analysis. Additionally, we have excluded TR 16A because it is the only trial report for a murder and conviction predating the enactment of RCW 10.95.120.

[103] Consistent with the majority opinion, our analysis is limited to only African-American and Caucasian defendants.

[104] African-American defendants included TR 29, TR 77, TR 88, TR 119, TR 135, TR 157, TR 177, TR 180, TR 185, TR 186, TR 194, TR 216, and TR 281.

[105] TR 29, TR 119, TR 135, TR 177, TR 180, TR 194, TR 216, TR 281.

penalty against African-American defendants, 62 percent resulted in the death penalty.

¶186 Excluding these 13 cases involving African-American defendants from the trial reports where the prosecution sought the death penalty, 60[106] cases involving Caucasians remain. Of these, the jury returned the death penalty in 24 cases.[107] Thus, Caucasians received the death penalty in 40 percent of the cases in which it was sought.

¶187 This means that of all African-American and Caucasian defendants for whom the prosecution sought the death penalty, African-Americans were much more likely than Caucasians to be sentenced to death (62 percent versus 40 percent). Based on this record, if the death penalty were color blind, one would expect to find that as a group, African-American defendants' crimes and past histories made them considerably more deserving of the death sentence than Caucasian defendants. But the trial reports contradict this expectation. When we consider key statistics for all African-Americans and Caucasians sentenced to death, it appears that African-American murder defendants as a group were no worse than Caucasian murder defendants.

¶188 For instance, African-American defendants sentenced to death averaged fewer aggravating circumstances (2.0) than Caucasians (2.6).[108] Moreover, if we consider

---

[106] TR 2, TR 3, TR 7, TR 9, TR 15, TR 20, TR 23, TR 25, TR 26, TR 31, TR 34, TR 34A, TR 36, TR 39, TR 42, TR 43, TR 44, TR 45, TR 47, TR 48, TR 50, TR 51, TR 52, TR 53, TR 56, TR 58, TR 60, TR 62, TR 63, TR 64, TR 65, TR 66, TR 73, TR 75, TR 76, TR 86, TR 92, TR 93, TR 95, TR 125, TR 132, TR 140, TR 144, TR 154, TR 164, TR 165, TR 167, TR 174, TR 175, TR 176, TR 181, TR 182, TR 183, TR 184, TR 190, TR 220, TR 227, TR 251, TR 258, TR 303.

[107] TR 3, TR 7, TR 9, TR 15, TR 31, TR 39, TR 43, TR 47, TR 73, TR 75, TR 76, TR 125, TR 132, TR 140, TR 144, TR 154, TR 165, TR 175, TR 176, TR 181, TR 183, TR 220, TR 251, TR 303.

[108] African-American defendants sentenced to death had the following numbers of aggravating circumstances: TR 194, 3; TR 180, 3; TR 281, 3; TR 177, 2; TR 216, 2; TR 29, 1; TR 119, 1; and TR 135, 1. Caucasian defendants sentenced to death had the following numbers of aggravating circumstances: TR 9, 4; TR 73, 4; TR 76, 4; TR 125, 4; TR 140, 4; TR 7, 3; TR 31, 3; TR 39, 3; TR 43, 3; TR 47, 3; TR 132, 3; TR

cases involving multiple murder victims, only 1 of the 8 African-Americans sentenced to death killed more than one victim, while 14 of the 24 Caucasians sentenced to death killed more than one victim.[109] Lastly, African-American defendants sentenced to death averaged fewer prior convictions (4.1) than Caucasians (4.6).[110]

¶189 The trial reports are evidence that once the prosecution seeks the death penalty against African-American defendants, those defendants are much more likely to be sentenced to death than their Caucasian counterparts. The majority attempts to disprove any disproportionality in sentencing by analyzing the pool of defendants *eligible* for the death penalty and concluding "the likelihood of a white defendant receiving the death penalty in Washington is practically the same as the likelihood of a black defendant receiving it." Majority at 362. This is a false comparison. The relevant issue is how often juries return a verdict of death when the prosecution seeks the death penalty. Including defendants against whom the prosecution has not chosen to seek the death penalty tells us nothing about unequal imposition of the death penalty when the jury is asked to decide death.

¶190 The majority again looks to the wrong statistical set when it divides the aggravated first degree murder cases into two time periods: 1981 to 1991 compared to 1991

154, 3; TR 175, 3; TR 176, 3; TR 251, 3; TR 15, 2; TR 144, 2; and TR 165, 2; the remaining six had one aggravating circumstance. Although African-American defendants sentenced to death had fewer aggravating circumstances than Caucasian defendants, African-American defendants averaged fewer mitigating circumstances (0.63) than Caucasian defendants (1.6).

[109] The sole African-American to kill multiple victims, TR 177, killed two victims. The 14 Caucasian defendants who killed multiple victims are TR 43, 4; TR 303, 4; TR 9, 3; TR 76, 3; TR 220, 3; TR 7, 2; TR 31, 2; TR 39, 2; TR 132, 2; TR 154, 2; TR 251, 2; TR 15, 2; TR 144, 2; and TR 75, 2.

[110] African-American defendants sentenced to death had the following numbers of prior convictions: TR 281, 10; TR 180, 8; TR 194, 4; TR 119, 4; TR 177, 3; TR 29, 2; TR 135, 2; and TR 216, unknown. The Caucasian defendants had the following prior convictions: TR 125, 15; TR 251, 15; TR 132, 13; TR 73, 9; TR 181, 8; TR 175, 6; TR 176, 6; TR 9, 4; TR 140, 4; TR 154, 4; TR 39, 4; TR 43, 3; TR 144, 3; TR 165, 3; TR 3, 3; TR 75, 3; TR 183, 3; TR 76, 2; TR 47, 2; and TR 15, unknown. One Caucasian defendant had no prior convictions: TR 303.

to 2011. Majority at 367-69. No reason is suggested for this division, which appears to be arbitrary. Moreover, the number of African-American defendants is sufficiently small that a small adjustment in the time periods can give rise to wide variations.

¶191 Additionally, the majority claims the fact that the State has sought the death penalty in a higher percentage of cases against Caucasian defendants than African-American defendants "refute[s] the notion that attitudes about race have led prosecutors to discriminate against black defendants in capital cases." *Id.* at 365. But the majority examines only cases in which defendants are *convicted* of aggravated first degree murder, without examining whether prosecutors charge the two populations at the same rate. A deeper inquiry into charging rates may explain why African-Americans, despite comprising fewer than 4 percent of Washington's population,[111] account for 25 percent of the cases in which defendants are sentenced to death.

¶192 Needless to say, these selective statistics do not tell the entire story, but they are objective quantitative measurements and not one of them explains why African-Americans seem so disproportionately sentenced to death. These statistics cannot tell us that petitioner Cecil Davis would not have received the death sentence if he had not been African-American. But the numbers warn of a significant danger that the death penalty might not be imposed in a fair, equal, or just manner. I would remand this case to the trial court for a hearing to evaluate whether racial disparities exist in the imposition of the death penalty and whether they are statistically significant.

¶193 I turn now to a review of the history of Washington's death penalty to evaluate the significance of this lopsided record.

---

[111] *State & County Quick Facts*, U.S. Census Bureau, http://quickfacts.census.gov/qfd/states/53000.html (last visited Sept. 14, 2012).

¶194 In Washington, the legislature has mandated that we engage in a comparative proportionality analysis in every capital case. RCW 10.95.130. Our legislature adopted this statutory requirement in response to United States Supreme Court cases from the 1970s that addressed racial discrimination in capital punishment and the problem of imposing the death penalty in an arbitrary and capricious manner. *See* LAWS OF 1981, ch. 138, § 13; LAWS OF 1977, Ex. Sess., ch. 206, §§ 1-2, 7, 10. A brief review of these cases and our legislature's response to them is helpful in framing the discussion of race and capital punishment in Washington.

¶195 In 1972, the United States Supreme Court considered the alarming issue of inconsistencies and racial disparities in the imposition of the death penalty. *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). *Furman*, a per curiam decision with five concurring and four dissenting opinions, brought to light several problems with the manner in which some states—there, specifically Georgia and Texas—imposed the death penalty. The concurring justices were primarily concerned that certain states' legislative grants of unfettered discretion to juries and judges in death sentencing were leading to arbitrary or racially discriminatory results. *See, e.g., id.* at 256-57 (Douglas, J., concurring) ("[T]hese discretionary statutes are unconstitutional in their operation. They are pregnant with discrimination and discrimination is an ingredient not compatible with the idea of equal protection of the laws that is implicit in the ban on 'cruel and unusual' punishments."); *id.* at 293 (Brennan, J., concurring) ("[The infliction of the death penalty] smacks of little more than a lottery system."). Because of these concerns, the Court reversed and remanded the death sentences of three African-American men. *Id.* at 239-40 (per curiam).

¶196 Following *Furman*, the states engaged in a flurry of legislation to ensure that their death penalty statutes and sentencing schemes were constitutional. *See* FRANKLIN E. ZIMRING & GORDON HAWKINS, CAPITAL PUNISHMENT AND THE AMERI-

CAN AGENDA 38-45 (1986) (discussing state legislative re-
sponses to *Furman*); *see also Gregg v. Georgia*, 428 U.S. 153,
179 n.23, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (plurality
opinion) (noting the increase in state legislative activities
prompted by *Furman*). Georgia, whose laws were at the
center of the controversy in *Furman*, reworked its statutes
to provide safeguards ensuring that the death penalty was
not applied in an arbitrary or discriminatory fashion. *See*
1973 Ga. Laws 159, § 4.

¶197 These new statutes quickly made their way back to
the United States Supreme Court: in 1976, the Court
upheld the new statutes because "if the Georgia Supreme
Court properly performs the task assigned to it under the
Georgia statutes, death sentences imposed for discrimina-
tory reasons or wantonly or freakishly for any given cat-
egory of crime will be set aside." *Gregg*, 428 U.S. at 224
(White, J., concurring in judgment). The Court noted that
Georgia's new approach allowed the Georgia Supreme
Court to compare "each death sentence with the sentences
imposed on similarly situated defendants to ensure that the
sentence of death in a particular case is not disproportion-
ate." *Id.* at 198. Confident that the new laws "afford[ed]
additional assurance that the concerns that prompted [the]
decision in *Furman* [were] not present to any significant
degree," *id.* at 207, the Court indicated that Georgia's
statutory creation of comparative proportionality review
appropriately addressed *Furman*'s aims of eliminating
freakish, arbitrary, and racially discriminatory sentences in
the imposition of the death penalty.

¶198 On the same day that the Supreme Court heard
*Gregg*, it also considered another common state legislative
response to *Furman*. *Woodson v. North Carolina*, 428 U.S.
280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). North Carolina
and several other states, including Washington, had en-
acted statutes making the death penalty mandatory where

certain aggravating circumstances were present.[112] *Id.* at 286. These laws attempted to meet *Furman's* strictures by removing the limitless discretion of judges and juries that the Court found repugnant in *Furman*. *Id.* The Supreme Court struck down North Carolina's mandatory capital sentencing scheme in its entirety, noting that it was the "standardless sentencing power in the jury" that was constitutionally infirm in *Furman*, not the general discretion of juries in deciding whether a defendant should receive a death sentence. *Id.* at 302. Because North Carolina had "fail[ed] to provide a constitutionally tolerable response to *Furman's* rejection of unbridled jury discretion in the imposition of capital sentences," the Court made clear that mandatory death sentencing was unconstitutional. *Id.*

¶199 In the wake of the *Gregg* and *Woodson* decisions, many state legislatures, including Washington's, returned to the drawing board to ensure that their death penalty statutes would meet constitutional muster. *See* Timothy V. Kaufman-Osborn, *Capital Punishment, Proportionality Review, and Claims of Fairness (with Lessons from Washington State)*, 79 WASH. L. REV. 775, 790 (2004) (citing Barry Latzer, *The Failure of Comparative Proportionality Review of Capital Cases (with Lessons from New Jersey)*, 64 ALB. L. REV. 1161, 1168 n.29 (2001)).

¶200 The Washington Legislature sought the advice of the Attorney General, who provided a detailed opinion recommending that Washington model its death penalty laws after the Georgia statutes upheld in *Gregg*. 1976 Op. Att'y Gen. No. 15, at 11-13, 1976 WL 168499, at *6-7, 1976 Wash. AG LEXIS 117, at *19-20. The legislature responded by enacting legislation nearly identical to Georgia's statute, including the requirement of comparative proportionality review by the Washington State Supreme Court. *Compare*

---

[112] Washington voters overwhelmingly passed an initiative that required capital punishment upon conviction of aggravated murder in the first degree. *See* former RCW 9A.32.045-.046 (LAWS OF 1975-76, 2d Ex. Sess., ch. 9, §§ 1-2 (Initiative Measure 316, §§ 1-2); LAWS OF 1977, Ex. Sess., ch. 206, §§ 4-5), *repealed by* LAWS OF 1981, ch. 138, § 24, effective May 14, 1981.

RCW 10.95.130, *and* former RCW 10.94.030 (LAWS OF 1977, Ex. Sess., ch. 206, § 7), *repealed by* LAWS OF 1981, ch. 138, § 24, effective May 14, 1981,[113] *with* GA. CODE ANN. § 17--10-35 (enacted by 1973 Ga. Laws 159, § 4); *see also State v. Harris*, 106 Wn.2d 784, 798, 725 P.2d 975 (1986) ("The language in our statute is identical to that used in the Georgia statute and most of the other statutes which expressly provide for proportionality review.").

¶201 The legislative history regarding the enactment of comparative proportionality review in Washington also demonstrates that the legislature was responding to *Gregg*, *Woodson*, and *Furman* and believed the new statutory scheme would ensure that the death penalty in Washington would not be applied arbitrarily or discriminatorily. *See, e.g.*, Memorandum from David D. Cheal, Counsel, House Judiciary Comm., to Representative Pearsall, Constitutional Requirements of Death Penalty Legislation 1 (May 12, 1977) ("[Comparative proportionality review] is a further protection against arbitrariness and wide discrepancies in the application of the death penalty.") (on file with House File on Substitute H.B. 615, 45th Leg., 1st Ex. Sess. (1977)); Tr. of Proceedings of H.R., Substitute H.B. 615, 45th Leg., 1st Ex. Sess. (Apr. 29, 1977) (arguments during floor debate regarding the disproportionate imposition of the death penalty on racial minorities) (on file with House File on Substitute H.B. 615, *supra*).

¶202 To summarize, the timing, language, and history of our death penalty statutes indicate that the legislature was primarily concerned with maintaining the constitutional availability of capital punishment in Washington by enacting laws that, according to the United States Supreme Court, remedied the problems identified in *Furman*.

---

[113] The Washington Legislature first required comparative proportionality review in 1977. In 1981, the legislature repealed the 1977 statute, although it maintained the same statutory language, and added a definition of "similar cases" as well as the trial court questionnaire form currently in use by the trial courts to report on all aggravated murder cases. Kaufman-Osborn, *supra*, at 812-13 (discussing differences between the 1977 and 1981 statutes).

¶203 Although the United States Supreme Court has indicated that comparative proportionality review is not constitutionally required, *Pulley v. Harris*, 465 U.S. 37, 43-44, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984), RCW 10.95.130 still mandates it.[114] Accordingly, our comparative proportionality review should include fulfilling our statutory duty to ensure that racial discrimination does not pervade the imposition of capital punishment in Washington. In my view, the question is how to prevent our review from becoming an " 'empty ritual.' " Dissent at 388 (quoting *State v. Benn*, 120 Wn.2d 631, 709, 845 P.2d 289 (1993) (Utter, J., dissenting)).

¶204 I find it problematic and unworkable that we have endorsed the view of the United States Supreme Court in rejecting statistics on the impact of race on the imposition of the death penalty. *See In re Pers. Restraint of Davis*, 152 Wn.2d 647, 753-54, 101 P.3d 1 (2004) (citing *McCleskey v. Kemp*, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987)). *McCleskey* involved a black defendant convicted of murder for shooting a white police officer during a robbery of a furniture store in Georgia. 481 U.S. at 283. At trial and throughout his appeals and habeas petitions, McCleskey presented a statistical study that "purport[ed] to show a disparity in the imposition of the death sentence in Georgia based on the race of the murder victim and, to a lesser extent, the race of the defendant."[115] *Id.* at 286. Despite the Courts' acknowledgement that there was "some risk of racial prejudice influencing a jury's decision in a criminal case" and that statistics "may show only a likelihood that [race] entered into some decisions," *id.* at 308, the Court

---

[114] After *Pulley*, several states repealed their comparative proportionality review requirements, and other state supreme courts that had mandated such review abandoned it. *See* Kaufman-Osborn, *supra*, at 791-92 (citing Latzer, *supra*, at 1168 n.31 (listing the states that repealed statutes or abandoned precedent requiring comparative proportionality review)).

[115] The study found that the death penalty was imposed in 22 percent of cases involving black defendants and white victims, but was imposed in only 3 percent of the cases involving white defendants and black victims and in only 1 percent of the cases involving black defendants and black victims. 481 U.S. at 286.

simply concluded that such "disparities in sentencing are an inevitable part of our criminal justice system." *Id.* at 312. *McCleskey* leaves us with the question of what exactly would suffice to show racial discrimination in capital sentencing.

¶205 In Mr. Davis's previous personal restraint petition, this court relied on *McCleskey* to reject Mr. Davis's submission of similar Washington statistics that suggested that the death penalty is " 'imposed more frequently when the defendant is nonwhite and the victim is white, and never, or almost never, when the racial equation is reversed.' " *Davis*, 152 Wn.2d at 753 (quoting brief). But we did not examine the overall statistics on the frequency with which African-American defendants are sentenced to death compared to non-African-American defendants. Thus, our prior decision in *Davis* does not and cannot control our decision here.

¶206 Furthermore, the racial statistics in both *McCleskey* and *Davis* were put forth in the context of constitutional challenges under the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution. Those cases, even if decided correctly, are distinguishable from the statistics discussed in this opinion because these statistics focus on the duty imposed by our legislature to conduct comparative proportionality review to ensure that death sentences in Washington are not handed down arbitrarily or discriminatorily. I do not believe that we can address discrimination based on race or other factors in our death penalty cases if we do not consider the statistical trends that present themselves upon examination of trial reports in aggravated murder cases. If we refuse to engage in some form of statistical analysis, we render a nullity the entire statutory scheme we are charged with enforcing.

¶207 I am not alone in my confusion. Numerous commentators have expressed dismay over the failure of comparative proportionality review to address the issue of racial discrimination in capital punishment. Most of their

criticisms attack *McCleskey* for presenting the judiciary with a convenient way to sidestep the issue of racial disparities in the imposition of capital punishment. *See, e.g.*, David C. Baldus, George Woodworth & Catherine M. Grosso, *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUMBIA HUM. RTS. L. REV. 143, 144 (2007) (*"McCleskey* has nearly eliminated the incentive of federal and state courts and legislatures to address meaningfully the issue of racial discrimination in the administration of the death penalty and has provided them with a political and legal framework for denying and avoiding the issue."); Maxine Goodman, *A Death Penalty Wake-Up Call: Reducing the Risk of Racial Discrimination in Capital Punishment*, 12 BERKELEY J. CRIM. L. 29, 46 (2007) (*McCleskey* "effectively barred a petitioner's ability to prove systemic racism in capital punishment"); Bruce Gilbert, *Comparative Proportionality Review: Will the Ends, Will the Means*, 18 SEATTLE U. L. REV. 593, 620-21 (1995) (noting that "[c]omparative proportionality review in Washington realistically addresses only the 'outlier' case" and thus fails to "address discriminatory application of the death penalty"); Rebecca A. Rafferty, Note, *In the Shadow of* McCleskey v. Kemp*: The Discriminatory Impact of the Death Sentencing Process*, 21 NEW ENG. J. ON CRIM. & CIV. CONFINEMENT 271, 294 (1995) ("The result of *McCleskey* was to place a virtually insurmountable burden on death row defendants who are victims of racial discrimination.").

¶208 In addition to these criticisms, our own cases have repeatedly recognized that the purpose of conducting comparative proportionality review is "to avoid random arbitrariness *and imposition of the death sentence based on race.*" *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 270, 172 P.3d 335 (2007) (emphasis added); *see also State v. Cross*, 156 Wn.2d 580, 639, 132 P.3d 80 (2006); *In re Pers. Restraint of Stenson*, 153 Wn.2d 137, 148, 102 P.3d 151 (2004); *Davis*, 152 Wn.2d at 750-51; *State v. Elledge*, 144

Wn.2d 62, 80, 26 P.3d 271 (2001); *State v. Woods*, 143 Wn.2d 561, 615, 23 P.3d 1046 (2001); *State v. Davis*, 141 Wn.2d 798, 880, 10 P.3d 977 (2000); *State v. Elmore*, 139 Wn.2d 250, 985 P.2d 289 (1999); *State v. Brown*, 132 Wn.2d 529, 554-55, 940 P.2d 546 (1997); *State v. Stenson*, 132 Wn.2d 668, 759, 940 P.2d 1239 (1997); *State v. Brett*, 126 Wn.2d 136, 209, 892 P.2d 29 (1995); *State v. Gentry*, 125 Wn.2d 570, 655, 888 P.2d 1105 (1995); *Benn*, 120 Wn.2d at 680; *State v. Lord*, 117 Wn.2d 829, 910, 822 P.2d 177 (1991); *State v. Rupe*, 108 Wn.2d 734, 767, 743 P.2d 210 (1987).

¶209 In the past, we have stated that our statutorily mandated task when we conduct comparative proportionality review is not to " 'ascertain, in essence, mathematical proportionality.' " *Cross*, 156 Wn.2d at 639 (quoting *Brett*, 126 Wn.2d at 212-13). But I fail to see how we can assure capital defendants or the legislature that race does not affect whether a capital defendant receives the death penalty in Washington when we brush aside the very statistical data that would assist us in making this determination.

¶210 In light of this history of our death penalty statutory scheme, the conclusion is inescapable that we must examine the impact of the defendant's race upon the administration of the death penalty in Washington. But we are not statisticians. We cannot evaluate the significance or importance of these numbers without the assistance of competent experts. Pursuant to RAP 9.11, I would direct the superior court to conduct an evidentiary hearing into the statistical significance of the racial patterns that emerge from the aggravated-murder trial reports. I would direct the superior court to hear such relevant evidence as the parties offer and to make findings on the significance of the racial patterns. We would then be in a position to perform the proportionality analysis mandated by the legislature.

¶211 Alternatively, I join in Justice Fairhurst's dissent.

Reconsideration denied January 10, 2013.